[No. A128302. First Dist., Div. Three. Sept. 17, 2010.]

L.Z., Petitioner, v.
THE SUPERIOR COURT OF CONTRA COSTA COUNTY, Respondent;
CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES
BUREAU et al., Real Parties in Interest.

## COUNSEL

The Law Offices of Johnson & Johnson and Carin L. Johnson for Petitioner.

No appearance for Respondent.

Sharon L. Anderson, County Counsel, and Kathleen R. LaPlante, Deputy County Counsel, for Real Party in Interest.

## OPINION

### SIGGINS, J.—

### INTRODUCTION

L.Z. is the 17-year-old mother of baby Z.Z. She petitions the court pursuant to California Rules of Court, rule 8.452, to vacate a juvenile court order setting a hearing under Welfare and Institutions Code section 366.26[1] to consider termination of her parental rights. Because there is no substantial evidence that L.Z. knew or should have known that Z.Z. was physically abused prior to the diagnosis of the baby's injuries, we reverse the juvenile court's decision to deny L.Z. (Mother) reunification services and remand this case to the juvenile court for further proceedings consistent with our opinion.

### PROCEDURAL BACKGROUND

These dependency proceedings began when Z.Z. was two months old and suffered unexplained, nonaccidental injuries while in her parents' care that included a spiral fracture to her left humerus and nine broken ribs. An amended petition asserted juvenile court jurisdiction due to her parents' failure to protect her from harm as described in section 300, subdivision (b), and multiple instances of severe physical abuse as described in section 300,

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise noted.

subdivision (e). At a jurisdictional hearing in November 2009, the court sustained all the allegations of the amended petition.

The report for the dispositional hearing prepared by the Contra Costa County Children and Family Services Bureau (the Bureau) recommended that Z.Z.'s parents be denied reunification services and the case instead be scheduled for a hearing pursuant to section 366.26 to consider termination of their parental rights. The dispositional hearing was originally scheduled for December 2009, but was continued and conducted over three days from February to April 2010. At the conclusion of the dispositional hearing, the court announced its intention to deny reunification services and set the case for a termination hearing. Mother filed this petition and requested oral argument. We stayed the hearing scheduled for August 12, 2010, to allow our consideration of Mother's petition.

## FACTUAL BACKGROUND

Baby Z.Z. was born to teenage parents in June 2009. Both parents have abused alcohol. The father (Father) would often drink to the point where he would "pass out." Before she was pregnant Mother would also drink to the point where she was "tipsy," but claims to have been abstinent during her pregnancy. Once baby Z.Z. was born, Mother began to drink again even though she was breastfeeding the baby. Although she would sometimes consume three or four beers and a couple of shots of rum, Mother claimed she was always in control of her ability to care for the infant.

Domestic violence also seems to have been an issue for this young couple. Both admitted to instances of hitting and arguing with one another, and Mother claimed Father once put her into a chokehold while demanding to have sex with her.

Baby Z.Z. was living with her parents and her maternal grandmother when she sustained her terrible injuries. Although Mother noticed that Z.Z. seemed to be in pain for about a week, her injuries were not discovered until Mother brought her in to a regularly scheduled doctor's visit. After the examination was complete, Mother told the doctor she was concerned about the baby's left arm. The doctor thought the arm looked fine, but referred the baby for X-rays that showed the various fractures.

At first, Mother did not know how Z.Z. was injured, and could offer no explanation. Mother regretted that she had not sooner brought the baby to see the doctor, but she had previously brought the baby to doctors when they said there was nothing wrong with her. So, she did not immediately seek care

when she noticed the baby was not using her left arm. The only people who were ever alone with Z.Z. were Mother, Father and the baby's maternal grandmother.

Following discovery of the baby's injuries, Mother expressed her concern that baby Z.Z. might have been injured by Father. About a week before the doctor's visit, Mother had an argument with Father while Z.Z. was sleeping. Father went into the baby's room and came out with her screaming. Ever since, Mother noticed that the baby did not use her left arm as much as her right. When she asked Father about the baby's arm, he denied knowing anything about it. On reflection, she thought Father hurt the baby's arm following their argument. Mother was surprised the baby had fractured ribs. But her suspicion for all the injuries remained focused on the baby's father. She asked him to admit injuring the baby and to move out of their home. Mother also obtained a restraining order to keep Father away from her, and he was not allowed to visit the baby when she was admitted to the hospital.

Notwithstanding Mother's suspicion and account of the events, at the time of the dispositional hearing it remained unclear who injured Z.Z. and precisely how those injuries occurred, although the fracture to her humerus was a spiral one that would typically result if someone had twisted her arm.[2] Father said he could not remember how the baby was injured, and attributed his inability to remember to his drinking.

Z.Z. was admitted to the hospital on the day of her doctor's visit, and discharged to the care of a temporary foster parent a few days later. Mother was with baby Z.Z. more or less continuously during her hospital stay, and the hospital staff observed her to have a strong emotional attachment to the baby.

While she was in the temporary foster home, Mother visited Z.Z. almost every other day. She would attend to Z.Z.'s needs during the visits and called to inquire about Z.Z. on the days when she did not visit. The foster mother never saw Mother engage in any inappropriate behavior and thought Mother and baby had a close relationship. After about a month in the temporary foster home, Z.Z. was moved to the home of her paternal aunt, and Mother's visits were limited to one hour each week in the Bureau's office.

These weekly visits did not go as well as Mother's visits in the temporary foster home. Z.Z. was often fussy and would cry until she fell asleep,

---

[2] For example, although Mother told the social worker at the hospital that the baby's arm might have been broken by Father when he went into the baby's room after a domestic argument, she also said he might have hurt the baby when he was alone with her while Mother was talking with Father's mother.

refusing to take a bottle or be soothed by Mother. The relative foster parent reported that it took many hours for her to calm Z.Z. down after a visit. Mother appeared to the Bureau staff "to not be able to read the baby's cues, would not be interactive with the baby and would try to just 'shush her' to be quiet." Z.Z. would often arch her back and wriggle and cry when touched by either parent. Some visits near the time of the dispositional hearing were better, when the foster parent's presence "seemed to ease the baby," but Mother later asked that the foster parent not attend. In a January 2010 visit, Z.Z. reportedly "screamed out at the top of her lungs and could not be consoled" when Mother sat down on the couch with the baby. During a visit approximately a week before the first day of the dispositional hearing, Z.Z. was fussy for much of the time, and Mother was unable to soothe her, despite a social worker's suggestions. But when the Bureau staff handled Z.Z. before and after Mother's visits, she was "very interactive and very sweet and smiling and very active."

The social worker assigned to Z.Z.'s case testified that, based upon the difficult visits, it was her conclusion that Mother could not relate to or care for her baby, and the baby had no significant attachment to Mother. Accordingly, she and the Bureau recommended that Mother be denied services.[3] The Bureau formulated its plan right around the time the baby was moved from the temporary foster home.

Several months before Z.Z. was born, Mother began attending the Crossroads High School program for mothers and infants. She was doing well in school, but before this dependency began she was resistant to support or suggestions concerning her care for the baby. Once the baby was taken from her in these proceedings, Mother became a more active participant in the Crossroads program and began associating with a group of peers who were making sound choices for their babies. She was subjected to 13 random blood tests for alcohol and drugs and never had a positive test.[4] Her school counselor and therapist at Crossroads thought Mother could "integrat[e] the things that are taught to her," and that "additional education and parenting, continued support in alcohol abstinence, would . . . ensure that [Mother] could provide a safe home for her daughter."[5] But the Bureau and its social worker felt differently.

---

[3] But the recommendation to deny services was formulated early on, long before the dispositional hearing and before the testifying social worker assumed control of the case.

[4] Three tests were reported with "diluted" or inconclusive results.

[5] The confidence expressed by Mother's school counselor was also shared by counsel for baby Z.Z. who argued to the court at the dispositional hearing: "I have never seen the Department offer so little and parents accomplish so much, as what has happened in this case. And I have represented minors in other similar cases where I am thinking there is no way this baby is going to go back. And I am one of the most cautious people in the world when it

Although Mother was making progress and her visits with baby Z.Z. were more interactive, Bureau personnel did not think Mother was developing sufficiently in her ability to ever care for or nurture Z.Z. Mother was not receptive to suggestions or support during visits regarding how to soothe or comfort her baby. She did not seem to sufficiently stimulate the baby, and the baby was thriving in the care of her relative foster parents.

The court declined to order reunification services, and stated that "either parent may have caused these injuries. . . . [¶] . . . Neither parent in this case has assumed responsibility for their actions. Again, until that happens, how can I be sure that it won't happen again? And until they acknowledge responsibility and are treated for it, their behavior, there is a serious risk in my mind that it will happen again. . . . [¶] Either the father or the mother could kill this child. It's not necessary that the Court . . . determine who committed this act. The baby was hurt for several days. And as the physical evidence points out, the arm injury . . . occurred at a different time and point than the rib injury. [¶] So this means a vicious act was perpetrated, not once, but twice, and to expect this Court to believe that, 'Well, we were drinking so much that we passed out, and we don't remember what we did or what might have happened,' again, is nonsensical and not credible."

The court found no evidence of a close and positive attachment between Z.Z. and her parents that would indicate a failure to try reunification would be detrimental to Z.Z. The court also concluded "the parents will not benefit from services, and it's not in the best interest of the child to offer reunification services to the parents at this time." The court reduced visitation to twice a month, and set a hearing under section 366.26 for August 12, 2010.

## DISCUSSION

■ When a "child [is] brought within the jurisdiction of the court under subdivision (e) of Section 300 because of the conduct of that parent or guardian," the court may decline to provide reunification services. (§ 361.5, subd. (b)(5).) A child who "is under the age of five years and has suffered severe physical abuse by a parent, or by any person known by the parent, if the parent knew or reasonably should have known that the person was physically abusing the child" comes within the reach of section 300, subdivision (e). Severe physical abuse is defined to include more than one act of

---

comes to a little baby like this, but I am convinced that with the services, these parents can be reunited, and I am also convinced that the Department deliberately broke the bond between this child and her mother and offered no ability for the father to bond with her. [¶] I know that they have an adoptive family, a concurrent placement, and that's all they looked at. They did not look at and still do not give these parents and these extended families the credit they deserve. [¶] And so I am also asking the Department—I mean, I am also asking the Court to overrule the recommendation and give these parents six months of reunification services."

abuse where each act causes a bone fracture. (§ 300, subd. (e).) When the Bureau "proves by clear and convincing evidence that a dependent minor falls under subdivision (e) of section 300, the general rule favoring reunification services no longer applies; it is replaced by a legislative assumption that offering services would be an unwise use of governmental resources." (*Raymond C. v. Superior Court* (1997) 55 Cal.App.4th 159, 164 [64 Cal.Rptr.2d 33].) We review the court's decision to deny reunification services under the substantial evidence test to determine whether it is supported by evidence that is reasonable, credible, and of solid value. (*Curtis F. v. Superior Court* (2000) 80 Cal.App.4th 470, 474 [95 Cal.Rptr.2d 232].) "We do not reweigh the evidence, nor do we consider matters of credibility." (*In re E. H.* (2003) 108 Cal.App.4th 659, 669 [133 Cal.Rptr.2d 740].)

"Section 300, subdivision (e), and subdivision (b)(5) of section 361.5, however, do not require identification of the perpetrator. [Citation.] Read together, those provisions permit denial of reunification services to either parent on a showing that a parent or someone known by a parent physically abused a minor. [Citation.] Thus, 'conduct' as it is used in section 361.5, subdivision (b)(5) refers to the parent in the household who knew or should have known of the abuse, whether or not that parent was the actual abuser." (*In re Kenneth M.* (2004) 123 Cal.App.4th 16, 21 [19 Cal.Rptr.3d 752].)

There is no question here that baby Z.Z. has suffered severe physical abuse. There is also no evidence that Mother or baby Z.Z.'s maternal grandmother committed an act of physical abuse. The only evidence of the cause of baby Z.Z.'s injuries points to Father. In light of the lack of evidence or any finding by the court that Mother physically abused Z.Z., in order for the court to deny Mother reunification services pursuant to section 361.5, subdivision (b)(5) and section 300, subdivision (e) it was incumbent on the Bureau to demonstrate that Mother knew or should have known that she had an abused baby. (See *In re Kenneth M., supra*, 123 Cal.App.4th at p. 21.)

 Mother contends that the evidence presented at the dispositional hearing did not prove that she knew or reasonably should have known her baby was injured by abuse. We agree. The parties stipulated at the hearing that medical testimony would establish that if someone caused rib injuries to a young infant, another person "would not know about the injuries and would just see a fussy, crying baby." Even a pediatrician might not suspect the injuries unless he or she ordered an X-ray. Thus, the baby's rib injuries cannot support a conclusion that Mother should have suspected Father's abuse. The baby's fractured arm presents a closer question, and although the evidence demonstrates Mother was aware that there was something wrong with the baby's arm, we cannot conclude that the Bureau demonstrated by a

preponderance of the evidence that Mother should have known the injury to the baby's arm was caused by abuse. Although there was a stipulation regarding the lack of demonstrable significance of the baby's rib injuries, there was simply no evidence offered to show what Mother should have known due to the baby's impaired ability to use her left arm.

Although the juvenile court need not determine who was the actual perpetrator in order to make a decision on whether to offer reunification services (*In re Kenneth M., supra*, 123 Cal.App.4th at p. 21), that seems to be exactly what was troubling the court here. Twice the court remarked that services would not be provided unless and until the perpetrator of the physical abuse came forward and admitted inflicting injury on baby Z.Z. When neither Mother nor Father admitted inflicting physical abuse, the court denied both reunification services. The court was focused on securing the perpetrator's admission of guilt rather than ascertaining the legal measure of Mother's conduct required by section 300, subdivision (e).

The Bureau analogizes the circumstances in this case to criminal child endangerment as defined in Penal Code section 273a. It argues that Mother and Father's excessive alcohol consumption and the pugnacious nature of their relationship created circumstances that exposed Z.Z. to situations of extreme danger. This is probably true, and could support a jurisdictional finding under section 300, subdivision (e) that may be based upon the conduct of either parent. (See *In re E. H., supra*, 108 Cal.App.4th at pp. 669–670 [res ipsa loquitur doctrine applied to support jurisdictional finding where child was constantly in the custody of parents].) But here we are dealing with a decision under section 361.5, subdivision (b)(5) that conditions the denial of reunification services to a parent on the court's assessment of "the conduct of that parent." Although sufficient to establish dependency jurisdiction, reliance upon the general harmfulness of conditions prevailing in baby Z.Z.'s home does not prove Mother knew or should have known her baby was subject to severe physical abuse as defined in section 300, subdivision (e).

For these reasons, the evidence does not support a finding that Mother knew or should have known her baby was abused. Moreover, on this record it is not plausible that the evidence raised an inference that Mother should have known of the cause of the baby's injuries. Mother's conduct in reporting the arm injury to the doctor, the doctor's apparent inability to independently detect the baby's injuries during her checkup, and Mother's explanation for not going sooner to the doctor when she saw the baby was having trouble using her left arm overcome the potential for such an inference.

(3) Finally, as a matter of fairness, the court should not require one parent to admit to physically abusing the baby in order for the other parent to

be eligible for reunification services. If Mother said she abused her baby, we have no doubt she would be denied services. Yet, in order for Mother to receive reunification services, Father was required to admit he inflicted the abuse. The statutes do not predicate Mother's interest in possible reunification on Father's willingness to admit guilt. Baby Z.Z. suffered severe physical abuse. But the statutes do not permit the court to deny a parent reunification services simply because it cannot determine who inflicted the abuse unless it is proven that the parent knew or should have known the baby had been abused.

We have no insights on whether Mother is likely to succeed in reuniting with her daughter, and we readily understand the difficult circumstances that the juvenile court was required to weigh in this case. But the evidence does not support denial of services under sections 300, subdivision (e) and 361.5, subdivision (b)(5).

## DISPOSITION

The order denying Mother reunification services and setting this case for a hearing pursuant to section 366.26 is reversed. Mother is to be provided reunification services.

Pollak, Acting P. J., and Jenkins, J., concurred.

A petition for a rehearing was denied October 21, 2010.