Filed 6/27/13  G.V. v. Super. Ct. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| G.V.,<br><br>    Petitioner,<br><br>        v.<br><br>THE SUPERIOR COURT OF ORANGE COUNTY,<br><br>    Respondent;<br><br>ORANGE COUNTY SOCIAL SERVICES AGENCY et al.,<br><br>    Real Parties in Interest. | G048140<br><br>(Super. Ct. No. DP022677)<br><br>O P I N I O N |

Original proceedings; petition for a writ of mandate to challenge an order of the Superior Court of Orange County, Deborah C. Servino, Judge.  Petition denied.

Frank Ospino, Public Defender, Michael Hill, Assistant Public Defender, Scott Kawamoto and Dennis M. Nolan, Deputy Public Defenders, for Petitioner.

No appearance for Respondent.

Nicholas S. Chrisos, County Counsel, Karen L. Christensen and Aurelio Torre, Deputy County Counsel for Real Party in Interest Orange County Social Services Agency.

Law Office of Harold LaFlamme and Linda O'Neil for the minor.

\*　　　\*　　　\*

Petitioner G.V. (father) is the father of G.V. (child).[1]  He challenges the sufficiency of the evidence to support the order denying him reunification services pursuant to Welfare and Institutions Code section 361.5, subdivisions (b)(5) and (b)(6). (All further statutory references are to this code.)  We find the challenged order is supported by substantial evidence.

FACTS AND PROCEDURAL BACKGROUND

Because father challenges the sufficiency of the evidence, we review the facts in the light most favorable to the findings and conclusions of the juvenile court.  (*In re Tania S.* (1992) 5 Cal.App.4th 728, 733.)  The operative facts not taken from in-court testimony, are drawn from the jurisdiction/disposition reports prepared by Real Party in Interest Orange County Social Services Agency (SSA), which were admitted into evidence at the disposition hearing.

*1.  Initial Removal and Detention*

The basic facts surrounding the initial removal and detention of the child are not disputed.  At 1:30 a.m. on June 13, 2012, M.C. (mother) brought the then three-

---

[1]  M.C. also filed a notice of intent to file a writ petition, which she later withdrew.

2

month-old child to the emergency room. Mother stated the child was favoring his left leg and would not extend it. Initial X-rays revealed the child had a new fracture of the left tibia. The child also had a similar injury to the right tibia but it was healing. And the child also had one new rib fracture and multiple rib fractures estimated to be four to six weeks old. The doctors and radiologist stated these kinds of injuries are primarily found in child abuse cases and could see no other explanation.

Mother and father both denied knowing how the child sustained these injuries and provided no explanation. Both denied pulling the child's leg forcefully and denied seeing anyone pull his leg.

Mother admitted suffering from postpartum depression and stated she was taking prescribed medications. She denied feelings or thoughts of harming herself or the child, and she denied domestic violence in the home. Father acknowledged mother's postpartum depression but denied domestic violence.

The child was detained due to allegations of physical abuse and general neglect. A petition alleging serious physical harm, failure to protect, severe physical abuse and cruelty was filed based upon the facts described above. Subsequently the juvenile court ordered the child detained.

*2. Jurisdiction/Disposition Reports*

Further X-rays provided more details about the child's injuries. There were seven old rib fractures and two new ones. Dr. Daphne Wong, Medical Director of the Suspected Child Abuse and Neglect Team at Children's Hospital, Orange County stated the new fractures occurred less than seven days ago and the old fractures were two to three weeks old. She concluded the trauma did not appear to be accidental. The rib fractures would have been caused by someone squeezing the child's ribs very hard. The leg fracture would be the result of someone pulling and twisting the child's leg.

3

The child had been seen by Dr. James Kay at Mission Hospital about a month earlier. At that time the child had a fever and a bruise on his abdomen but it was explained that it was most likely from the child's car safety seat.

Mother told investigators she dropped the child off at the babysitter's before heading to work on June 12. When she picked him up the child and the leg seemed fine. He was kicking and smiling. About midnight, mother noticed the child's left leg was bent up really far. When she tried putting it down, he would put it right back. The child did not cry, but he did fuss about her trying to put his leg down. Mother and father both said nothing unusual had happened earlier in the evening.

Mother stated father did not take care of the child much. The child cries with father because the child does not know him and gets scared. Mother had never seen father hold the child in a rough way. She did not think father would hurt the child. She also said she never felt she would harm the child or herself. She stated that if she lost her temper with the child, she has placed him in the crib and walked away to take a breather. Upon reviewing the time frames with mother, Sheriff's Deputy Robert Pequeno opined the injury to the child had occurred between 8:30 p.m. and 10:00 p.m., "possibly" while in the care of his parents.

The babysitter told police she babysat the child for a week beginning on June 4, 2012. The first day she noticed if she held the child by his rib area under his arms, "he would cry" "and scream." This continued for the entire week. She remembered the child was moving both legs and was fine on June 12. Father told Dr. Wong he was not concerned about how anyone takes care of the child. He was not sure how long mother had been taking medications or how long she had been depressed. Father denied mother had any symptoms of depression since he had known her. He had not noticed any change in her behavior or mood swings.

Two months later father told the social worker he and mother had had an argument where mother threw a shoe hitting father in the face. When police arrived they

4

saw father had a small, red lump under his left eye. The parents filed restraining orders against one another, precluding subsequent visits together.

Subsequently, father advised the social worker he had concerns about how the child was hurt. He alleged mother had a "nervous breakdown" once while attempting to breastfeed the child, stating to grandmother, "take the baby before I hurt him." Father also reported mother's depression was so bad her physician increased the dosage of her antidepressant. According to father, mother always said the baby cries "too much" and she can't "handle motherhood." This confirmed mother's previous statement to the social worker her antidepressant had been increased due to "baby blues" after the child's birth. Mother admitted sometimes motherhood was "overwhelming" due to her being a first time mother and father deciding not to help her, but she felt she did her best to care for the child. She said she was doing "everything" for the child and in the beginning she felt this was the reason the child would cry so much with father because he never helped out so the child did not know him.

Father believed mother may have hurt the child the day she took him to the emergency room. He and mother had a big argument that day. She was really angry with him and was being violent. Father stated the child cried a lot but he assumed it was because he was "colicky" and sick. Father said he did not notice any injuries.

*3. Jurisdiction Hearing*

At a contested jurisdiction hearing the court accepted into evidence several jurisdiction/disposition reports prepared by SSA, and mother submitted on those reports. The parties also presented live testimony.

*a. Dr. James Kay*

Dr. Kay testified he had been a pediatrician since 2007, and he was a mandated reporter. Dr. Kay examined the child on 10 dates from March 3, 2012 to June

5

5, 2012, for well-child exams and various ailments. Dr. Kay did not see anything that led him to believe the child was being physically abused or that father should have known of any abuse.

Dr. Kay testified leg fractures would be more difficult to diagnose if both legs were broken, and admitted he had never diagnosed an infant with rib fractures. He would look for rib fractures if he already suspected child abuse. He did not recall either parent stating the child screamed when held under the arms. He did not look at the child's legs in a detailed manner on June 5.

*b. Father*

Father testified he would spend six to 10 hours holding the child on Sundays, and would typically hold the child anywhere from 10 to 20 hours during the entire week. He saw nothing to indicate the child was being hurt or abused prior to the emergency room visit June 13.

Father denied ever being rough with the child or ever seeing anything indicating the child had fractures. He remembered mother saying she heard a popping or clicking sound when she picked up the child in early June, but did not recall ever hearing that the babysitter reported the child cried every time he was held around his ribs.

Father acknowledged mother had stated the child needed to be taken from her so she would not hurt him. Father did not recall telling SSA mother complained about the child crying too much with her or that she felt overwhelmed by motherhood. Father thought mother was doing a great job with the child. He did not have any concerns about her parenting or her depression, since she addressed the issues promptly. He did recall mother being emotional and sad during her pregnancy but not after the child's birth.

Father denied having ever been violent with anybody but acknowledged mother had put her hands on him and pushed him three to six times between June 12 and

6

August 15. He also denied mother had ever been physically aggressive with him, other than pushing.

*c. Dr. Daphne Wong*

Dr. Wong testified she is certified in general and child abuse pediatrics. She examined the child and his medical records.

Dr. Wong testified Dr. Kay may have failed to detect the child's fractures in early June, because he was focusing on other parts of the child's body and those injuries were healing. The leg injuries would have begun "healing in a short amount of time, and once they start healing there may not be that much pain associated unless you're really manipulating that limb." With respect to the child's rib fractures, "if they are healing, generally, unless you're really pressing or squeezing on the child, you may not see that – you may not see any outside bruising."

"And the swelling and things like that may or may not have even been there at the beginning." If the doctor did not manipulate the limb, it would be possible to miss a broken bone diagnosis. "[W]hen the fracture happened it would be painful so the child would cry, would be irritable, and probably for the next few days with manipulation would show some sign of pain." For the first few days after the fracture there would have been some pain. Once the bone starts healing, it becomes more likely that someone might miss it.

Dr. Wong estimated the earliest possible date for the child's rib fractures was three to four weeks prior to his hospital admission. Over that time he would frequently have been fussy.

Dr. Wong said neither parent had an explanation for the child's injuries. Father told her the child had been fussy for about a month and a half. Mother said the child had been fussy since birth. Mother initially reported the child had been experiencing pain for three days, but then stated she had just noticed it that evening.

7

According to Dr. Wong, depending on the number of fractures, if a child is held around the rib cage, the child may have been fretful. If held from the back and bottom, the child "probably won't have that much fussiness." Dr. Wong indicated that she would be "worried about a rib fracture" if there was a popping or clicking sound when picking up a child around the torso.

### d. Jurisdiction Ruling

The juvenile court found true by a preponderance of the evidence the allegations of serious physical harm, failure to protect and severe physical abuse and scheduled a disposition hearing.

### 4. Disposition Hearing

A contested disposition hearing was conducted over portions of nine days. The court read, considered and accepted into evidence without objection, the eight jurisdiction/disposition reports and supplemental reports prepared by SSA and SSA submitted on those reports. A number of witnesses including mother and father testified.[2]

### a. Senior Social Worker Laquita Hudson

Ms. Hudson recommended against providing reunification services because it had not been shown "that either parent has recognized or admitted to the abuse of this child . . . ." "[W]e have . . . an infant that has severe injuries and there is no explanation

---

[2] Although several other witnesses testified the trial court specifically found they were not credible. Moreover, their testimony is not relevant.

of these injuries, so . . . it would lead one to think how could they possibly benefit from further services if . . . there is no understanding of how this child was actually injured."

*b. Mother*

Mother testified past domestic violence could have harmed the child. Mother was aware the child had broken bones, but did not know what had happened to him. She offered several possible explanations, including her belief father was responsible for some of the injuries, because of what had happened with domestic violence.

*c. Father*

Father testified mother had been aggressive with him on the day the child was detained, and in a few incidents after the child had been taken away. Although "open" to the possibility the child's injuries were non-accidental, father believed the child had been injured accidentally, as described by mother. Before the child's broken bones were revealed, mother had not disclosed the incidents in which she later claimed the child may have been injured.

Father completed an anger management program. Looking back at what he learned in the program, he saw several red flags in mother's behavior, during her pregnancy, and after the child had been taken away. In hindsight, he would have asked to care for the child when mother was frustrated. Withdrawing and helping mother less was a "big mistake."

*d. Disposition Ruling*

At the conclusion of the disposition hearing, the juvenile court declared the child to be a dependent, removed the child from parental custody, denied reunification services to both parents pursuant to section 361.5, subdivisions (b)(5) and (b)(6), and set

9

a permanency hearing under section 366.26. The juvenile court detailed the factual and legal basis for these rulings on the record.

DISCUSSION

Father challenges only the juvenile court's order denying him reunification services. He contends there is not substantial evidence to support the application of either section 361.5, subdivision (b)(5) or section 361.5, subdivision (b)(6). We disagree.

*1. General Law and Standard of Review*

When a child is removed from the custody of his parents, the juvenile court must generally order the social worker to provide reunification services to the parents. (§ 361.5, subd. (a); *In re William B.* (2008) 163 Cal.App.4th 1220, 1227.) However, when it is shown "by clear and convincing evidence that a dependent minor falls under subdivision (e) of section 300, the general rule favoring reunification services no longer applies; it is replaced by a legislative assumption that offering services would be an unwise use of governmental resources." (*Raymond C. v. Superior Court* (1997) 55 Cal.App.4th 159, 164.) Reunification services may be denied when the juvenile court finds by clear and convincing evidence one or more of the specifically enumerated exceptions applies. (§ 361.5, subd. (b).)

"We review the court's decision to deny reunification services under the substantial evidence test to determine whether it is supported by evidence that is reasonable, credible, and of solid value. [Citation.] 'We do not reweigh the evidence, nor do we consider matters of credibility.' [Citation.]" (*L.Z. v. Superior Court* (2010) 188 Cal.App.4th 1285, 1291-1292 (*L.Z.*).) "Under this standard of review we examine the whole record in a light most favorable to the findings and conclusions of the juvenile court . . . . [Citation.] We must resolve all conflicts in support of the determination and

10

indulge all legitimate inferences to uphold the court's order. Additionally, we may not substitute our deductions for those of the trier of fact. [Citations.]" (*In re Albert T.* (2006) 144 Cal.App.4th 207, 216.)

"When applying the substantial evidence test, however, we bear in mind the heightened [clear and convincing] burden of proof. [Citation.]" (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 971.) The evidence must be so clear as to leave no substantial doubt, and must be sufficiently strong to command the unhesitating assent of every reasonable mind. (*Ibid.*)

*2. Section 361.5, subdivision (b)(5)*

Reunification services may be denied when the juvenile court finds "the child was brought within the jurisdiction of the court under subdivision (e) of Section 300 because of the conduct of that parent . . . ." (§ 361.5 subd. (b)(5).) "'[C]onduct' as it is used in section 361.5, subdivision (b)(5) refers to the parent in the household who knew or should have known of the abuse, whether or not that parent was the actual abuser." (*In re Kenneth M.* (2004) 123 Cal.App.4th 16, 21.) The identity of the actual abuser need not be shown. (*Ibid*.)

In this case, the juvenile court was well aware section 361.5, subdivision (b)(5) applies to a parent who knew or should have known of the abuse, irrespective of whether the identity of the abuser was shown. As the juvenile court stated, "This is precisely the type of area where the court does not specifically have to say which parent did it. The conduct of the parent, either they personally inflicted it on the child or they knew or reasonably should have known." Here, the juvenile court expressly found by clear and convincing evidence, "Parent . . . should have known this child had been injured, and that's only for the legs. There were also old and new injuries to the ribs that parents knew or should have known about."

11

In opposition to these express findings, father first contends there is no credible evidence to suggest father physically abused the child. But the trial court did not rely on father being the perpetrator, only that he should have known of the injuries.

Father next contends substantial evidence does not support the finding he either knew or should have known of the child abuse. With respect to the first prong, there is abundant evidence in the record from which the juvenile court could legitimately infer father had actual knowledge of the abuse. Based upon the nature and extent of the injuries inflicted, and the differing stages of healing observed, there can be no doubt the abuse occurred over a period of weeks if not months. Furthermore, there is no doubt father was regularly in close proximity to, and often even in physical contact with, the child throughout the period of abuse, and particularly during the crucial period of time between 8:30 p.m. and 10:00 p.m. on June 12, 2012. This evidence alone is sufficient to support the finding of the trier of fact with respect to actual knowledge.

With respect to the second prong, there is overwhelming evidence in the record from which the juvenile court could legitimately conclude father should have known of the abuse. Everything we have just described above concerning actual knowledge prong applies *a fortiori* under this prong as well. On this point father argues if a medical professional such as Dr. Kay could reasonably be expected to miss a child's broken bones, then a lay parent such as father should not be expected to reasonably recognize the child injuries. We are not persuaded.

The fact Dr. Kay observed nothing on or before June 5 which caused him to believe either parent was abusing the child, or that father should have known the child was being physically abused, does not undermine the juvenile court's conclusion father should have known of the abuse by June 13. As Dr. Kay himself testified, and Dr. Wong as well, there are good reasons why Dr. Kay might not have noticed anything was amiss on June 5, and none of those reasons conflicts with the finding father should have known. These include the fact the injuries were healing and the pain had subsided and Dr. Kay

12

was focusing on other things. Furthermore, even if nothing else there can be no doubt father should have known of the injuries inflicted on June 12, 2012.

Father's reliance on *L.Z.*, *supra*, 188 Cal.App.4th 1285 to support this argument is misplaced. In *L.Z.*, the court found insufficient evidence the mother knew or should have known of the child's injuries, a fractured arm and nine broken ribs. (*Id.* at pp. 1292-1293.) But the facts of that case are distinguishable.

There the parties stipulated that a doctor's testimony would prove a parent would not necessarily know if another person had injured a baby's ribs, and in fact even a pediatrician would likely diagnose it only after looking at an X-ray. The baby would only be crying and fussy. In addition, there was no evidence the mother should have known about the arm injury. She had taken the baby to the doctor for a regular visit and had been told nothing was wrong with her. Later, when the mother was concerned about the baby not using her arm for a week, she took the baby back to the doctor who could see nothing wrong until an X-ray was taken.

In our case, there was no such stipulation. To the contrary Drs. Kay and Wong explained why the injuries might have been missed by Dr. Kay, most notably due to lack of pain. But the pain would have been evident immediately upon injury. Moreover, in *L.Z.*, *supra*, 188 Cal.App.4th 1285, the mother told the doctor about her concerns. There is no evidence Dr. Kay was given any such information.

And here, a substantial amount of evidence shows father should have known of the injuries. He knew of mother's violence, having been a victim of it himself. He acknowledged mother saying she heard a popping sound when she picked the child up. And the babysitter reported the child screaming in pain every day for a week when held around his ribs.

Father was aware of mother's depression, both during her pregnancy and after the birth of the child, and the need for an increase of her antidepressant. She had broken down while feeding the child and told the grandmother to take him before mother

13

hurt him.  Mother told him she could not handle motherhood.  He admitted he did not help with the child enough, despite knowing of mother's violence and depression.

Under these circumstances, and even bearing in mind the heightened clear and convincing burden of proof applicable in juvenile court, the evidence is so clear as to leave no substantial doubt, and it is sufficiently strong to command the unhesitating assent of every reasonable mind.  Thus, there is substantial evidence to support the finding father knew or should have known of the abuse.

*3. Section 361.5, subdivision (b)(6)*

Having found substantial evidence supports the juvenile court's denial of reunification services under section 361.5, subdivision (b)(5), we need not discuss the alternative grounds for denial under section 361.5, subdivision (b)(6).

DISPOSITION

The petition for writ of mandate is denied.

THOMPSON, J.

WE CONCUR:

O'LEARY, P. J.

MOORE, J.

14