Filed 9/27/16  In re Bethany A. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re BETHANY A., a Person Coming Under the Juvenile Court Law. | B266553 (Los Angeles County Super. Ct. No. DK06855) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>KAREN S. et al.<br><br>    Defendants and Appellants. | |

APPEALS from orders of the Superior Court of Los Angeles County. Annabelle G. Cortez, Judge.  Affirmed.

Maureen L. Keaney, under appointment by the Court of Appeal, for Defendant and Appellant Karen S.

Liana Serobian, under appointment by the Court of Appeal, for Defendant and Appellant Ricardo A.

Tarkian & Associates and Arezoo Pichvai for Plaintiff and Respondent.

_____

Appellants Karen S. (mother) and Ricardo A. (father) separately appeal from the juvenile court's termination of their parental rights to Bethany A. (Bethany, born May 2014). Mother also appeals from the denial of her Welfare and Institutions Code section 388 petition.[1] Mother, who was 15 years old when Bethany was born, contends the juvenile court erred by failing to appoint her a guardian ad litem (GAL). Father, who turned 18 in October 2014, joins in her arguments. We find no error and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

**The Petition**

On August 13, 2014, the Los Angeles County Department of Children and Family Services (Department) filed a petition on behalf of then two-month-old Bethany, under section 300, subdivisions (a), (b) and (e). The petition alleged that Bethany had suffered "non-accidental trauma," including the following: a large, chronic subdural hematoma; multiple fractures to her skull; multiple "old" rib fractures; multiple bruises to her eyes, face, and ear; scratches to her neck; and bruises to her shoulder and back. Mother had no explanation for the injuries. The injuries were not consistent with father's explanation. And the parents failed to obtain necessary medical care for Bethany's injuries for nine days.

**Detention Report**

On August 7, 2014, mother took Bethany to the hospital because the baby had a bump on the left side of her head. Bethany was diagnosed with hydrocephalus, a condition in which water causes the brain to swell. She had a bruise and scab on her left eye. Bethany was discharged the same day.

On August 8, 2014, the Department's social worker interviewed the parents, who were living together with the paternal grandmother and other relatives. Mother denied that Bethany fell and stated that she did not know how the baby was injured. Mother and father stated that Bethany was always with mother and was never left alone with anyone else. Both the paternal grandmother and paternal aunt denied seeing any injuries on

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

Bethany and thought the parents treated her well. The maternal grandmother and maternal uncle also thought the parents treated Bethany well. However, on July 29, 2014, the maternal grandmother observed three small bruises on the left side of Bethany's forehead, after mother and father took Bethany to visit a relative. When the maternal grandmother inquired about the bruises, mother denied that anything had happened to Bethany.

Later in the day on August 8, 2014, Bethany was transported by ambulance back to the hospital after a radiologist evaluating Bethany's x-rays observed that she had skull fractures. The Department's social worker spoke with hospital staff, who noted that Bethany's chart reflected that Bethany had multiple rib and skull fractures, bruising on both eyes, and there were "concerns for strangulation." The injuries were ruled as nonaccidental. A medical student reported to the Department that Bethany needed an MRI since there were concerns about brain trauma and neck injuries, and that Bethany had "old bleeding in the skull."

Father was interviewed by the police on August 8, 2014, and reported that he had laid Bethany on the outer edge of the couch and accidentally pushed her off when he stretched out his arms. Mother asked father why he did not tell her this before.

**Detention Hearing**

Mother and father appeared at the detention hearing, and the juvenile court appointed separate counsel to represent them. The court found father to be the presumed father of Bethany. The court ordered Bethany detained, and informed the parents that the Department might seek the denial of family reunification services. The court granted the parents monitored visits two or three times a week. Per the request of mother's trial counsel, the court also ordered that the parents were not to be interviewed regarding the allegations in the petition.

**Jurisdiction and Disposition Report**

In October 2014, the Department submitted a 54-page jurisdiction and disposition report. Bethany had been placed with the K. family on August 18, 2014.

On September 15, 2014, father was arrested and placed in juvenile hall, after stating to police that he had deliberately dropped Bethany onto the kitchen tile floor after becoming frustrated when she would not stop crying. When the police asked mother if father caused Bethany's injuries, she stated, "He would never do [this]." Later, when the police had father tell mother what he had done to Bethany, mother repeatedly stated, "You did not do that." Mother denied being in the kitchen at the time. Father stated, "I did it. I'm telling them the truth. She [mother] was in the room, and I was in the kitchen." Father estimated that mother was approximately 35 to 50 feet away from him and Bethany at the time. Mother cried and stated, "I didn't know him like that."

On October 6, 2014, the Department received the maternal grandmother's consent to interview mother. During the interview on October 7, 2014, the Department's Dependency Investigator (DI) asked mother which person normally cared for Bethany, and mother stated, "I cannot answer this question. My attorney told me not to answer any questions regarding my daughter." The DI asked mother how many times Bethany had visited the doctor since her birth and if Bethany had any medical issues. Again, mother stated, "I cannot answer." Mother reported that she was currently enrolled in parenting classes and individual therapy, but could not produce documentation per her attorney's orders. Mother answered other questions by the DI, for example, denying domestic violence, drug abuse and gang involvement. When informed by the DI that the Department would be recommending no reunification services, mother began to cry.

On October 7, 2014, the Department also received the paternal grandmother's consent to interview father in juvenile hall. During the interview the following day, father repeated that Bethany was always with him and mother.

On October 9, 2014, Dr. Janet S. Arnold-Clark, a board-certified child-abuse pediatrician, provided the Department with a written medical report, concluding that Bethany "suffered multiple serious injuries that occurred at different points of time."

4

While the multiple bruises and abrasions on her face, neck and back were new, the multiple rib fractures were at least two to four weeks old, and the large fluid collection around her brain had accumulated slowly. Dr. Arnold-Clark opined that Bethany's injuries were not consistent with a fall and were "definitely from intentionally inflicted trauma." Bethany had 11 to 12 rib fractures from someone squeezing her ribs too hard, causing them to snap. The bloody fluid on her brain was consistent with a "direct blow, definitely inflicted." The multiple bruises and scratches were "not consistent with a single impact." Bethany also had elevated liver enzymes, probably because she "was either kicked or punched in the abdomen."

In subsequent interviews, the maternal and paternal relatives continued to deny and disbelieve that mother or father could have intentionally hurt Bethany. The Department recommended that no reunification services be provided pursuant to section 361.5, subdivision (b)(5). The jurisdiction and disposition hearings were continued.

**Additional Information**

In a letter dated November 19, 2014, Dr. Thomas J. Grogan, an orthopedic surgeon, stated: "To a non-perpetrator caregiver, the only evidence of injury would have been when the swelling over the parietal skull fracture would have started. It appears that is when Mother brought the child in for medical attention. The rib fractures themselves would have hurt at the time of original injury, but appear to have all occurred at the same time, and the child would have been quickly consolable and an unskilled caregiver who was not there for the original injury would never know the rib fractures existed."

On December 1, 2014, mother's trial counsel reported that mother had retained Dr. Grogan as an expert.

On December 9, 2014, mother completed a 12-week advanced parenting class.

**Jurisdiction and Disposition Hearing**

Mother and father appeared at the jurisdiction and disposition hearing on December 30, 2014. Dr. Grogan, testifying on behalf of mother, stated that Bethany's injuries could have been the result of nonaccidental trauma. He testified that an unskilled parent could cause the rib fractures by picking her up too roughly. Dr. Grogan also

5

testified that Bethany's skull and head injuries could have been caused from the impact of falling or being dropped.

On February 6, 2015, the juvenile court sustained the petition and declared Bethany a dependent child of the court under section 300, subdivisions (a), (b), and (e). While the court found Dr. Grogan credible, his opinions conflicted with those of Dr. Arnold-Clark and other medical records that were admitted into evidence. The court credited Dr. Arnold-Clark's opinion, given that she was a board-certified child-abuse pediatrician. The court found that mother was Bethany's primary custodial parent and Bethany was always in her care, yet mother had no explanation for Bethany's injuries. Father's explanations were inconsistent and "the more he was interviewed, the more he admitted to harming Bethany. But even with his admissions, it still doesn't account for all the injuries that she suffered." The court continued, "Given the multiple injuries that Bethany suffered, given the fact that mother and father were the primary caretakers, and specifically the mother, given the fact that this was a non-ambulatory infant, . . . the Court finds that . . . parents knew or reasonably should have known about Bethany's injuries."

The juvenile court denied family reunification services for mother and father under section 361.5, subdivisions (b)(5) and (6). The court granted mother monitored visits two or three times a week, and once a week for father while in custody. The court set the matter for a section 366.26 hearing on June 5, 2015.

**De facto Parent Request**

On May 15, 2015, Bethany's foster parents, Mr. and Mrs. K., applied for de facto parent status for Bethany. They attached to the request a letter in which they stated that Bethany had lived with them for almost 10 months and was healthy and thriving. Bethany had "formed a strong attachment" to their family and was "flourishing" in their care. Mr. and Mrs. K. stayed by Bethany's side and comforted her while she stayed at two different hospitals in October 2014.

They also attached a declaration from Bethany's infant educator, who stated that Mr. and Mrs. K. had "played an instrumental role in Bethany's progress. Throughout our

6

sessions, the foster family and other children in the home have showered Bethany with an abundance of love, affection, and attention." The Infant Educator continued, "Bethany is apparently placed in a loving home and she has thrived in the time that she has been there."

Mr. and Mrs. K. also attached a declaration from Dr. Arnold-Clark, who had become Bethany's pediatrician. She reported that Mr. and Mrs. K. had been consistently responsive caregivers, and that Bethany had thrived in their care. She continued, "In cases of infant brain trauma, it is so important that the caregivers provide a loving, consistent, interactive home environment to allow the brain to heal," and that Mr. and Mrs. K. were providing her with that type of environment.

On May 19, 2015, Mr. and Mrs. K.'s adoptive home study was approved.

**Section 366.26 Report**

The social worker recommended that Bethany remain in the home of Mr. and Mrs. K. under a permanent plan of adoption. The K.'s did not want a formal post-adoption agreement but indicated they were open to biological family members having contact with Bethany.

Mother continued to have monitored visits with Bethany twice a week for two hours. Mrs. K. stated that although mother was immature due to her age, she had gained confidence in interacting with and holding Bethany. Mrs. K. reported that Bethany would allow mother to hold her, but would become fussy and want to return to Mrs. K. Father had three visits with Bethany since being placed in custody; he acted appropriately during the visits.

Mother appeared at the section 366.26 hearing on June 5, 2015. The court continued the matter to August 10, 2015, for a contested hearing.

**Mother's Section 388 Petitions[2]**

On August 3, 2015, mother filed a section 388 petition for modification of the juvenile court's order denying family reunification services. Her accompanying

---

[2]     Father also filed a section 388 petition, which he does not discuss on appeal.

declaration stated: "I have done everything requested of me to demonstrate my love, commitment, and suitability as a parent for Bethany. I was only 15 years when this case started, and it has not been easy for me, especially since I do not drive and have to rely on public transportation or other people to drive me, but my commitment and love of my daughter has caused me to do whatever I can to get her back." She attached certificates showing completion of parenting classes and art therapy, as well as positive letters from high school teachers. The court set the petition for hearing on August 10, 2015.

On August 10, 2015, mother filed a second section 388 petition requesting that the jurisdictional and dispositional findings and orders be vacated and that she be appointed a GAL. Mother stated: "My attorney was ineffective in representing me in pretrial proceedings and at trial. I am only 16 years old. I did not understand the proceedings and was unable to assist my attorney in preparing my case. No guardian ad litem was appointed to assist me in understanding the proceedings and in assisting my attorney. Since the trial, my teacher, Barbara [M.], has helped me in understanding the proceedings." The petition attached a declaration from Barbara M., who stated that she was mother's independent studies teacher and had been a teacher for 20 years at a school for pregnant and parenting teenage girls. Ms. M. declared that after the section 366.26 hearing was scheduled, mother informed her that she "did not understand anything about the proceedings," and that she did not understand a letter from her attorney. The letter indicated there were no issues to pursue by writ petition and that mother could petition the appellate court on her own, but mother received the letter the day before the deadline for filing a petition and her request for an extension was denied. Ms. M. was concerned that mother "is too young to understand the workings of a system as complex as the dependency system. And no one has been representing the best interests of this minor child who also happens to be a mother."

At the hearing on August 10, 2015, the juvenile court addressed mother's second section 388 petition, noting that "at no point . . . did [mother] indicate to the Court that [she] wasn't understanding the proceedings." Mother's trial counsel then informed the court that the second section 388 petition was filed by Barbara M. and that it was being

withdrawn.  Per the request of mother's trial counsel, the court set a hearing on the first section 388 petition.  The matter was continued to August 17, 2015.

**Combined Sections 388 and 366.26 Hearing**

Mother and father were both present at the combined hearing on August 17 and August 18, 2015.  The juvenile court first addressed mother's first section 388 petition.  The court denied the petition, finding that mother did not meet her burden of demonstrating changed circumstances and that granting the petition would not be in Bethany's best interest.

The court then turned to the section 366.26 hearing.  Mother testified that she maintained regular visits with Bethany.  The visits would take place at the foster family agency office, a McDonald's restaurant, or at a Carl's Jr. restaurant.  During the visits, mother would play with Bethany, change her diaper, feed her, and read to her.  Mother would also take toys and extra clothes for Bethany.  Bethany would smile and laugh when she saw mother.  At the end of the visits, Bethany would watch mother until she could not see her anymore.  Other relatives testified about positive interactions between mother and father and Bethany.

Following testimony and the arguments of counsel, on August 18, 2015, the juvenile court found by clear and convincing evidence that Bethany was adoptable, that no exception to termination of parental rights applied, and terminated the parental rights of mother and father.  The court designated Mr. and Mrs. K. as the prospective adoptive parents and granted their request for de facto parent status.

The appeals of mother and father ensued.

## DISCUSSION

Code of Civil Procedure section 372, subdivision (a), previously required a trial court to appoint a GAL when a party to a dependency proceeding was a minor.  However, effective January 1, 2009, the Legislature amended Code of Civil Procedure section 372 to allow a parent who is a minor to appear in a dependency proceeding without a GAL.  (Code Civ. Proc., § 372, subd. (c)(1).)  The amended statute requires the court to appoint a GAL if the minor parent is unable to understand the nature of the proceedings or to

9

assist trial counsel in preparing the case.  (Code Civ. Proc., § 372, subd. (c)(2).)  Also effective January 1, 2009, the Legislature enacted section 326.7, which states: "Appointment of a guardian ad litem shall not be required for a minor who is a parent of the child who is the subject of the dependency petition, unless the minor parent is unable to understand the nature of the proceedings or to assist counsel in preparing the case."

An "error in the procedure used to appoint a guardian ad litem for a parent in a dependency proceeding is trial error that is amenable to a harmless error analysis rather than a structural defect requiring reversal of the juvenile court's orders without regard to prejudice."  (*In re James F.* (2008) 42 Cal.4th 901, 915.)  Under the harmless error analysis, we do not set aside a judgment unless a different result would have been probable had the error not occurred.  (*In re A.C.* (2008) 166 Cal.App.4th 146, 157.)

Mother argues that the juvenile court had a "sua sponte duty" to appoint her a GAL due to her young age.  This is simply no longer the state of the law.

Mother makes no showing that she did not understand the nature of the proceedings or that she was unable to assist her trial counsel in the preparation of her case.  She instead argues that she was afforded no protection in the case as evidenced by the fact that, despite an order from the juvenile court that mother and father not be interviewed regarding the allegations in the petition, the DI "persisted" in attempts to gain information from mother.  But it was mother's own trial counsel who requested the order in the first place.  Additionally, during the interview, mother showed that she did understand the nature of the proceedings and was able to follow the instructions of her counsel.  When the DI asked mother who normally cared for Bethany, mother answered, "I cannot answer this question.  My attorney told me not to answer any questions regarding my daughter."  Mother also did not answer questions regarding Bethany's doctor's visits.  She answered questions only about things that were not related to the allegations in the petition.

Mother's attempt to show that the appointment of a GAL would have changed the outcome of this case is unpersuasive.  Mother points out that she consented to the filing of a writ petition after the section 366.26 hearing was set.  Her counsel filed a letter in

10

this court indicating there were no meritorious issues and requested an extension for mother to pursue the writ petition on her own. We granted a 15-day extension, then mother wrote a letter asking for more time, which we denied. Mother asserts that her counsel's determination of no meritorious issues was "flawed." Mother simply concludes "[t]here is no doubt the appointment of a GAL would have made a difference." A conclusion is not evidence.

The record shows that mother appeared for every hearing; her trial counsel retained Dr. Grogan as an expert, and he testified on her behalf at the jurisdiction hearing; the juvenile court received evidence that mother completed a 12-week advanced parenting class and art therapy sessions; and the court granted mother a hearing on her section 388 petition.

Mother's reliance on *L.Z. v. Superior Court* (2010) 188 Cal.App.4th 1285 does not assist her. There, the reviewing court found there was no evidence that the mother committed any act of physical abuse on her baby and that reunification services for her should not have been bypassed. The only evidence of the cause of the baby's injuries pointed to the father. The mother and father had incidents of domestic violence, and the mother expressed concern that the father had caused the baby's injuries after she learned of them. (*Id*. at p. 1289.) In the instant case, the juvenile court found that mother was Bethany's primary custodial parent, and that Bethany was always in her care, yet mother had no explanation for Bethany's injuries. While father provided explanations for Bethany's injuries, the court found that his explanations were inconsistent and "the more he was interviewed, the more he admitted to harming Bethany. But even with his admissions, it still doesn't account for all the injuries that she suffered."

## DISPOSITION

The orders terminating mother's and father's parental rights to Bethany and denying mother's section 388 petition are affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.

_____, J.
          ASHMANN-GERST

We concur:

_____, P. J.
      BOREN

_____, J.
      HOFFSTADT