Filed 9/26/14  S.E. v. Superior Court CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| S.E. et al., | |
| Petitioners, | E061265 |
| v. | (Super.Ct.Nos. J252040 & J252041) |
| THE SUPERIOR COURT OF SAN BERNARDINO COUNTY, | OPINION |
| Respondent; | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDINGS; petition for extraordinary writ.  Cheryl C. Kersey,

Judge.  Petition denied.

Michael J. LaCilento, for Petitioner S.E.

David M. Levy, for Petitioner L.M.

Christine R. Sabans, for Minors.

Jean-Rene Basle, County Counsel, and Dawn M. Messer, Deputy County Counsel, for Real Party in Interest.

No appearance for Respondent.

Real Party in Interest, San Bernardino Children and Family Services (the department), filed juvenile dependency petitions pursuant to Welfare and Institutions Code section 300[1] alleging, among other things, that H.M. (born 2013), the child of petitioners L.M. (father) and S.E. (mother) (collectively, parents) had died from unknown causes after she was found to have suffered seven fractures to her ribs and a broken arm (f-1 & f-2); parents' child A.M. (born 2012) had sustained serious and potentially life threatening injuries including, but not limited to, a spiral fracture of his leg (e-1 & e-2); and parents' had failed to protect minor C.E. (born 2004) from physical abuse.[2]  The juvenile court dismissed dependency proceedings as to minor C.E. and entered family law orders placing him with his father, J.J.,[3] permitting visitation with mother.  The juvenile court found the remaining allegations true; removed A.M. from parents' custody; denied parents reunification services pursuant to sections 361.5, subdivisions (b)(5), (6), and (12); and scheduled the section 366.26 hearing.

In his petition, father contends the court erred in prohibiting Dr. Charles Hyman from testifying that minors suffered from Temporary Brittle Bone Disease (TBBD).

---

[1]  All further statutory references are to the Welfare and Institutions Code.

[2]  The "f" allegations were later dismissed.{2RT 406; 3CT 617-618}

[3]  J.J. is not a party to this petition.

Mother joins this argument, but additionally maintains the juvenile court erred in declining her request for bifurcation of the jurisdictional and dispositional hearings, erred in finding the e-5 allegation true, and abused its discretion by denying her reunification services. We deny the petitions.

FACTS AND PROCEDURAL HISTORY

On September 25, 2013, the department received an immediate response referral when H.M. stopped breathing. Father called the paramedics. Medical personnel were unable to revive her. H.M. had no signs of outward trauma, but X-rays revealed the infant had a broken arm and several fractures at various stages of healing, which doctors believed were the result of squeezing. The coroner discovered seven healing rib fractures, which he opined occurred between seven and 21 days prior to her death.

The social worker made a safety plan with mother, who was at work at the time of H.M.'s death. The plan allowed mother, C.E., and A.M. to stay with their maternal grandmother (MGM) pending further investigation. On October 2, 2013, C.E. and A.M were brought to the Children's Assessment Center (CAC). Mother brought previous X-rays of A.M.'s leg taken in July 2012. Mother said she was initially informed A.M. had a fracture, but was later told his leg pain was due to a viral infection. Dr. Mark Massi at CAC reviewed the X-rays and said the then five-month-old A.M. had a spiral fracture of his right femur (thigh bone) which Massi believed was the result of abuse.

C.E. had a big red spot in his eye caused by a broken blood vessel. No explanation for the injury was provided. Dr. Massi believed the injury was caused by a poke to the eye. C.E. also had scars on his back, which were of concern to Dr. Massi.

3

C.E. said the scars were the result of sliding down the wall while doing wall sits as punishment: "Wall sits were described as sitting against the wall with no support of the child's buttocks while holding his arms in the air. The parents stated they use this form of punishment as they were advised by a prior social worker not to use corporal punishment." "According to Dr. Massi, regarding [C.E.], 'The child has three (3) notable findings—subconjunctival hemorrhage and two (2) areas of scarring—two (2) of which have no clear explanations.'"

Mother reported that H.M was born with the umbilical cord wrapped around her neck and she had read on the internet this could cause fractures. "The doctors stated age of the fractures did not coincide with these injuries happening at birth." Detectives said parents had passed polygraph tests and the detectives did not believe parents were responsible for H.M.'s death. Mother was told she and minors could move back into the family home on November 4, 2013.

At a multidisciplinary team meeting held on November 7, 2013, Doctors May Young and Mark Massi of CAC expressed grave concerns minors were back in the family home. Additional findings were made by Dr. Young regarding A.M., including two rib fractures and fractures to the right forearm (radius and ulna). Both doctors believed the injuries to H.M. and A.M. were intentionally inflicted. They said it was not possible for a viral infection to have caused A.M.'s fractures.

At a contested detention hearing on November 14, 2013, the social worker testified parents denied abusing minors. The department had already placed minors in protective custody. The juvenile court formally detained minors.

In the jurisdictional and dispositional report filed December 2, 2013, the social worker reported mother had provided A.M.'s medical records, which reflected no symptoms of abuse. Nonetheless, none of the medical records supported mother's contention a viral infection was responsible for A.M.'s fractures. H.M.'s cause of death was not able to be determined from the autopsy. H.M.'s broken arm was determined to be newer than six weeks, so it could not be medically associated with birth trauma.

The autopsy protocol released March 27, 2014, authored by pathologist Dr. Steven Trenkle, left the cause and manner of H.M.'s death undetermined. Dr. Trenkle noted that, "Although this young infant had at least one and possibly more episodes of inflicted trauma leading to bilateral multiple rib fractures which are now healing, as well as a fracture of the left mid humerus which is now healing, no fatal trauma was noted at the autopsy. . . . [¶] The multiple rib fractures may have occurred in one instance or may have occurred over a several day period of time. The infant would have likely been in pain, particularly with the fracture of the left arm . . . . [¶] Although there is no definite fatal injury, the presence of previous inflicted injuries is quite concerning." The fractures were observable only under microscopic examination.

At a pretrial hearing on April 25, 2014, mother's counsel requested bifurcation of the jurisdictional and dispositional hearings: "I'm also going to request a bifurcation of the juris[dictional] and dispo[sitional] issues on this case due to the fact there's different burdens of proof. Obviously, juris[dicition] is the burden of proof of the county and [on] the dispo[sition], the burden shifts to us. So I am going to have some requests to bifurcate." The juvenile court asked if there was any objection. No party objected. The

5

court then noted, "So that should shorten things a bit. So I will order the case be severed and the hearing on Wednesday will be a trial management conference for jurisdiction. The Court at that time will set a new hearing date for jurisdiction and also for this disposition."

On April 30, 2014, a different judge noted, "Also there was a request to bifurcate the proceedings. I wasn't here for that, but at this time, the Court will deny that request to bifurcate as all the parties are getting an extra six weeks to prepare based on their availability and witnesses. I will not be setting aside time again for all of you." Mother's counsel stated, "Just for the record, I want to say I was requesting a bifurcation." The court responded, "Go ahead and give your authority for your request for bifurcation." Mother's counsel replied, "Based on a different standard of proof, burden of proof. The burden of proof is clear and convincing on the juris[dictional] issue. The burden shift[s] on the dispo[sitional hearing] if found true to our burden of proof. I'll be happy to provide [points and authorities] at a later date . . . ." The court concluded, "No need for points and authorities. I'm aware of the burden of proof. [¶] There is also no need for bifurcation. The minors were detained in, it looks like, November of 2013. The case now, based on your request, the fact you were retained after another attorney was assigned, will now be, let's see, give or take, eight months old. No need for bifurcation."

On May 21, 2014, the department filed a motion in limine to exclude evidence and opinions by father's retained medical expert, Dr. Hyman, regarding evidence or opinions on TBBD, metabolic bone disease, or pediatric fragility disorder. C.E. was placed with

6

J.J. on May 16, 2014. On May 29, 2014, father's counsel filed a response to the department's motion to exclude.

The combined, contested jurisdictional and dispositional hearing began on June 2, 2014. Dr. Trenkle testified consistently with his autopsy protocol. He observed that, "you can get fractures accidentally or nonaccidentally." "The fractures themselves don't tell me. Typically, in accidental injuries there is a history of some traumatic event that occurred that would explain multiple fractures. In this case, there wasn't such a history." "[T]here was no history of a significant traumatic event, so in that case, I thought they were more likely inflicted injuries." "There would have been some pain when the fractures initially occurred. . . . I think that the fractured arm would have been more painful than typical[] rib fractures. [¶] . . . [¶] . . . I would expect a caretaker to know if the child had a fractured arm. With the rib fractures, that is another story. The caretakers might not notice that."

Dr. Trenkle testified TBBD is not a diagnosis generally accepted by the medical community and that its progenitor had been discredited. Osetogeneses Imperfecta (OI) is a genetic disease of the bones, which makes them more prone to fracture. Dr. Trenkle did not run any tests to determine whether H.M. had OI; however, he was not aware of any tests that could be run for OI on deceased individuals. Living tissue is necessary to run such tests. Dr. Trenkle observed that although Dr. Hyman's report speculated the trauma to H.M. could be from OI, Dr. Trenkle disagreed with Dr. Hyman's conclusions. Rather, Dr. Trenkle opined that H.M.'s rib fractures were caused by the squeezing of her

7

chest or the result of a blow or fall. He opined her arm fracture was caused by "[m]aniputlation of the arm or a blow."

Dr. Massi testified he examined A.M. and C.E. at CAC. Dr. Massi reviewed X-rays taken of A.M. on July 18 and 23, 2012. He found a fracture of the right femur. The skeletal survey of A.M. revealed fractures of the right eighth rib, the radius, and ulna. A viral syndrome would not cause a fracture. Dr. Massi suspected physical abuse in the past: "Any fractures in a nonambulatory child without a history of trauma would be concerning for physical abuse." C.E. had a subconjuctival hemorrhage on his eye, scarring on his upper back on both sides, and a curvilinear scar on his side. Dr. Massi did not perform tests for OI; he did not suspect either minor had OI.

Mother's friend testified she had observed mother on numerous occasions with minors. She never saw any abuse. Mother was caring and loving with minors. Parents' friend testified minors were well cared for. The social worker testified mother's psychological reported reflected mother would benefit from services. Visitation with parents went well. Parents were participating in services. The social worker recommended denying parents reunification services due to the severity of injuries sustained by minors with no explanation for how they occurred.

Dr. Karmel Azmy, the pediatrician who treated A.M. four to five times, testified he had diagnosed A.M. with a viral infection on July 18, 2012. Azmy requested an X-ray because mother said she noted A.M. was having pain in his right leg. The radiologist report of the X-ray came back reading, "'Normal, right tibia.'" Azmy did not suspect child abuse. Azmy noted A.M. was "'skeletally immature,'" which "means all his

8

ossification centers are not closed . . . ." Azmy asked for a second X-ray and skeletal survey on July 23, 2013, because of an irregularity in the first X-ray. The findings from the skeletal survey were normal; no fractures were found.

Mother testified she never abused minors. She never observed father abuse minors. Parents would have C.E. conduct wall sits as discipline. C.E. asked on one occasion to take his shirt off while doing so. He then said his back hurt. There appeared to be a rug burn on his back. The next day or two, he had light scabbing on his back.

Mother took A.M. to Azmy because he was not moving his leg. Azmy told her A.M. had a viral infection. Azmy ordered X-rays and a skeletal survey. The results came back indicating nothing was wrong with A.M.'s leg; he simply had a viral infection. A.M.'s leg improved thereafter. Mother believed the injuries to H.M. could have occurred when she fell off the couch when with father, or due to her birth with the umbilical cord wrapped around her neck.

Father testified sometime between September 10, and 12, 2013, H.M. fell off his chest while they were both sleeping on the couch. She fell two feet off the couch onto the carpet. She cried, he held her, she stopped crying, he put her to bed, and she fell asleep. On September 25, 2013, H.M. was lying face down. He picked her up. She was lifeless and not breathing. He gave her CPR. She threw up milk. He called 911. Paramedics came into the house and began giving her CPR. They took her to the hospital. Father admitted requiring C.E. to do wall sits as discipline. Father admitted a criminal conviction for robbery. Father denied having anything to do with the injuries to

9

minors. He believed H.M.'s injuries were caused when she was born with the umbilical cord wrapped around her neck.

Prior to Dr. Hyman's testimony the juvenile court noted it had "reviewed the Points and Authorities, Motion in Limine from [the department]. [Father's counsel], you did respond. The Court indicated off the record that the Court will be allowing Dr. Hyman to testify. He appears, from the documents I received, that he will qualify as an expert in pediatrics. [¶] However, the request, and really the motion in limine, is not so much as whether he qualifies as an expert, it is the area he will testify—the area he will be allowed to testify regarding his analysis, examination of all of the records that were provided to him from [father's counsel], and in his preparation of his report."

The court ruled Dr. Hyman's "experience in radiology will be allowed, along with the X-rays that were provided to him." "What will not be allowed is any posturing or theorizing, speculation regarding Temporary Brittle Bone Disease. The Court, after reviewing the brief filed by [the department], agrees with the position of the Department in that it lacks sufficient [re]liability, and Dr. Hyman will not be able to meet requirements for scientific reliability and admissibility to posit a theory of Temporary Brittle Bone Disease in this case. [¶] [Father's counsel], you will be able to ask Dr. Hyman anything that you have heard already in this Court. Dr. Trenkle and Dr. Massi have rendered opinions, so you will be able to ask Dr. Hyman whether or not he agrees or disagrees with their analysis and conclusions because that is further foundation for Dr. Hyman's opinions."

10

Dr. Hyman testified he had reviewed the records in this case, including the X-rays of A.M. Dr. Hyman noted fractures to A.M.'s femur and eighth rib. Dr. Hyman opined that Dr. Massi had mischaracterized the fracture to A.M.'s femur as a spiral fracture: "I think it better fits to be a longitudinal fracture because a spiral fracture wraps around the bone. This doesn't wrap around the bone here." "This is [a] very mild type of fracture, nondisplaced. That is why it was hard to be seen. Three doctors and X-rays—they didn't see it initially. It was the family's advocacy to say, 'Something is wrong with my baby's right leg' that kept bringing things to the doctor's attention." With a nondisplaced fracture, "the bones aren't separated. It heals itself."

Dr. Hyman noted that it is the type of fracture which occurs when children utilize walkers. He further observed, "Children with bone fragility or adults with bone fragility—they can be microfractures which progress." Dr. Hyman characterized the rib fracture as not a severe injury. Contrary to Dr. Massi's finding, Dr. Hyman did not see any fracture to the ulna or radius. Dr. Hyman opined the fractures were not the result of result of abuse.

Dr. Hyman reviewed the X-rays of H.M. He observed only one rib fracture from the X-ray. That injury could have occurred by rolling off a couch. The humeral fracture could have been caused by a fall. Rib fractures can be caused by CPR. The rib fractures noted by Dr. Trenkle were so small most of them did not appear on the X-ray. Dr. Hyman opined the fractures did not cause H.M.'s death.

Regarding the injuries to both minors, Dr. Hyman noted, "They're not high-force injuries. The fact that two siblings had fractures makes me think, somebody involved in

11

bone science, that there is some genetic—some minor genetic association that could be."

"Two and a half percent of a normal population have bone fragility, and they have multiple single-nucleotide polymorphism, so there's probably hundreds of genetic things that would make bones more fragile from different aspects of the physiology of the bone. So we're not talking about—OI has not been ruled out. I don't think the children have or had OI, but there are certainly other things associated with bone fragility." "The clinical diagnosis of fragile bones in bone science is fracturing with low force regardless of how bones look on plane films or on DEXA evaluation." There is evidence H.M. had fragile bones: "The child had evidence of increased bone turnover on X-ray and had evidence of diminished mineralization, less-than-ideal mineralization."

Dr. Thomas Grogan, an orthopedic surgeon specializing in children's sports traumas, reviewed the medical records of A.M. and H.M. He observed that A.M. had a spiral fracture, which is cause by rotation or torque motion. Dr. Grogan noted that Dr. Trenkle had utilized microscopic analysis of H.M.'s bones when conducting the autopsy in order to observe seven rib fractures. The fractures were not otherwise visible on an X-ray. "[T]hey're microscopic, if that helps. So they're very minimal and certainly not [of] any clinical significance." The fractures would not require treatment. It is not possible the rib fractures were cause by CPR. Dr. Grogan could not opine whether child abuse was a cause of the injuries. When evaluating such cases, "[he] always think[s] about is it a pattern for abuse, and I don't see that here."

12

DISCUSSION

A.     Bifurcation of the Jurisdictional and Dispositional Hearings.

Mother contends the juvenile court violated her right to due process by denying her request for bifurcated jurisdictional and dispositional hearings. We hold the court erred by denying mother's request. However, we hold the error was harmless.

"A dependency proceeding under section 300 is essentially a bifurcated proceeding. The court first determines whether the minor is a dependent child subject to the jurisdiction of the court within the description set out in section 300." (*In re Jamie M.* (1982) 134 Cal.App.3d 530, 535.) "Once the court has determined the minor is a person described by section 300 and has assumed jurisdiction it '*shall then proceed to hear evidence on the question of the proper disposition to be made of the minor . . . .*' (§ 356.)" (*Ibid.*, italics added.) In stating the rule, the *Jaime* court relied on a previous version of section 356 which expressly required separate proceedings as indicated by the italicized language *ante*. The language reading "to be made" following the "proper disposition" was deleted by amendment in 1982. However, the language "shall then proceed to hear evidence on the proper disposition" remained. (Amended by Stats.1982, c. 978, § 18, eff. Sept. 13, 1982, operative July 1, 1982.) A 1986 amendment rewrote the section to delete the phrase "and then shall proceed to hear evidence on the question of the proper disposition of the minor." (Stats.1986, c. 1122, § 9.) It is unclear why this language was deleted.

Nevertheless, section 358, subdivision (b), regarding the disposition reads, "*After finding that a child is a person described in Section 300, the court *shall hear evidence* on

13

the question of the proper disposition to be made of the child.  Prior to making a finding required by this section, the court may continue the hearing on its own motion, the motion of the parent or guardian, or the motion of the child."  (Italics added.)

Subsequent to the amendment of section 356, courts have continued to construe the statutory language as requiring separate jurisdictional and dispositional hearings, though they may occur on the same day:  "'A section 300 dependency hearing is bifurcated to address two distinct issues.  First, at the jurisdictional hearing, the court determines whether the child falls within any of the categories set forth in section 300.  If so, the court may declare the minor a dependent child of the court.  [Citation.]  Then, at the dispositional hearing, the court must decide where the child will live while under its supervision, with the paramount concern being the child's best interest.  [Citation.]' [Citation.]"  (*In re Michael D.* (1996) 51 Cal.App.4th 1074, 1082, quoting *In re Corey A.* (1991) 227 Cal.App.3d 339, 346; *In re Alicia O.* (1995) 33 Cal.App.4th 176, 182 [same]; *In re Heather B.* (1992) 9 Cal.App.4th 535, 543 ["Juvenile court proceedings are bifurcated, as they were under prior law.  Under this procedure the jurisdictional hearing addresses the question whether the child is described by section 300, and the question whether the child should be adjudged a dependent child is not determined until the dispositional hearing.  [Citations.]"]; *In re Corey A.*, at pp. 345-346; *In re Marquis H.* (2013) 212 Cal.App.4th 718, 724; *In re A.S.* (2011) 202 Cal.App.4th 237, 243-244.)

"Although the dispositional hearing often follows immediately after the jurisdiction hearing, and in some counties the social worker prepares a combined jurisdictional and dispositional court report or social study, the dispositional hearing is

considered a separate and distinct hearing.  [Citations.]" (1 Cal. Juvenile Dependency Practice (Cont.Ed.Bar 2002) Nature of Dispositional Hearing, § 5.1, p. 263.)  "The dispositional hearing has been compared with sentencing in a criminal proceeding [citation] . . . ." (*Id*. at pp. 263-264, citing *In re Jennifer V*. (1988) 197 Cal.App.3d 1206, 1209.)

California Rules of Court, rule 5.682(g)[4] explains that *after* the jurisdictional hearing, "the court must proceed to a disposition hearing . . . ." Rule 5.684(f)(4) explains, "*After* making the [jurisdictional] findings . . ., the court must proceed to a disposition hearing . . . ." (Italics added.)  Rule 5.686(b) provides, "If petitioner alleges that [Welfare and Institutions Code] section 361.5 [subdivision] (b) is applicable, the court *must* continue the proceedings not more than 30 calendar days." (Italics added.)

Nonetheless, we note that joint jurisdictional and dispositional hearings are frequently, if not, typically held. (*In re A.S.*, *supra*, 202 Cal.App.4th at p. 241 [joint]; *In re N.M.* (2011) 197 Cal.App.4th 159, 171 [same]; *In re David H.* (2008) 165 Cal.App.4th 1626, 1644 [same]; *San Diego County Dept. of Social Services v. Superior Court* (1996) 13 Cal.4th 882, 886 [same]; *In re Ricky H.* (1992) 10 Cal.App.4th 552, 556 [Fourth Dist., Div. Two] [same]; *In re G.B.* (2014) 227 Cal.App.4th 1147, 1152 [combined hearing]; *In re G.P.* (2014) 227 Cal.App.4th 1180, 1191 [same]; *In re M.V.* (2014) 225 Cal.App.4th 1495, 1504 [same]; *In re Ashly F.* (2014) 225 Cal.App.4th 803, 805, 807 [same]; *Tonya M. v. Superior Court* (2007) 42 Cal.4th 836, 840-841 [same]; but see *In re A.M.* (2010)

---

[4]  All further rule references are to the California Rules of Court.

15

187 Cal.App.4th 1380, 1386 [juvenile court grants department's request to bifurcate hearings].)

On the other hand, in dependency cases wherein a supplemental petition is filed, "'a bifurcated hearing is required. [Citations.]'" (*In re Javier G.* (2005) 130 Cal.App.4th 1195, 1200, citing *In re Jonique W.* (1994) 26 Cal.App.4th 685, 691 ["The bifurcated procedures for original petitions (§ 300) and supplemental petitions (§ 387) are conceptually identical"]; *In re A.O.* (2004) 120 Cal.App.4th 1054, 1061, fn. 4 ["A bifurcated hearing is required in proceedings on a supplemental section 387 petition. [Citation.] Here, although the court did not bifurcate the hearing, [the mother] did not ask for the hearing to be bifurcated, or object when it was not. Accordingly, she has [forfeited] her right to contest it as error here"]; *In re Joe A.* (1986) 183 Cal.App.3d 11, 24 ["The quoted rule makes clear that a bifurcated hearing is required. The first part of the hearing, equivalent to the jurisdictional hearing in an original juvenile proceeding focuses on the truth of the factual allegation(s) in the supplemental petition and the truth of the allegation that the existing disposition is ineffective in rehabilitating the minor. Only after both of these findings have been made does the court proceed to the second part of the hearing, equivalent to the dispositional hearing in the original proceeding"].)

In juvenile delinquency proceedings, bifurcated jurisdictional and dispositional hearings are likewise required. (*In re Julian R.* (2009) 47 Cal.4th 487, 495 ["A bifurcated hearing is then held. At the first phase—the jurisdictional hearing—'the juvenile court decides whether the petition concerns a person described in section 602.' [Citation.] . . . [¶] At the second phase—the dispositional hearing—the juvenile court

hears 'evidence on the question of the proper disposition to be made of the minor.' [Citation.]"]; *In re James B.* (2003) 109 Cal.App.4th 862, 874 [Fourth Dist., Div. Two] ["The bifurcated juvenile court procedure prescribed in [] sections 701, 702, and 706 . . . [citations] is designed to provide a jurisdictional hearing at which competent evidence is adduced, and to make certain the jurisdictional order is made *before* the social study report containing material irrelevant to the issue of guilt is considered. [Citation.]' [Citation.]"]; *In re Christopher S.* (1992) 10 Cal.App.4th 1337, 1343 [same].)

"[T]he Legislature intended to create a bifurcated juvenile court procedure in which the court would first determine whether the facts of the case would support the jurisdiction of the court in declaring a wardship and thereafter would consider the social study report at a hearing on the appropriate disposition of that ward. This procedure affords a necessary protection against the premature resolution of the jurisdictional issue on the basis of legally incompetent material in the social report." (*In re Gladys R.* (1970) 1 Cal.3d 855, 859-860, fn. omitted [juvenile delinquency proceedings].)

Although the policy reasons for requiring bifurcated jurisdictional and dispositional hearings in section 300 proceedings are not expressly stated in either the statutes or case law, the apparent purpose can be gleaned from case law as an attempt to prevent prejudice to the defendant by prohibiting a juvenile court from either simultaneously considering jurisdictional and dispositional findings or even considering dispositional findings prior to jurisdictional findings in joint hearings based on evidence that would have been excluded from a separate jurisdictional hearing if the court had bifurcated the proceedings. Thus, we hold that parents have a statutory right to bifurcated

17

jurisdictional and dispositional hearings. The court erred in denying mother's request for bifurcation of the hearings.

As did the court below, the department mischaracterizes a request for bifurcation of the proceedings as a request for a continuance. However, as noted above, a separate dispositional hearing can be held immediately after the jurisdictional hearing without a continuance. Indeed, the hearings can often be held on the same day.

Nonetheless, mother does not identify any specific constitutional right to a bifurcated hearing that would implicate deprivation of her due process rights. Indeed, here, mother was first given notice of a combined jurisdictional and dispositional hearing on December 2, 2013, when the department filed its first report. The department filed a combined, addendum report on January 16, 2014. Mother did not request bifurcated hearings until April 25, 2014, after she had already been granted a continuance. Although the original court before which she made her bifurcation request granted the request, the subsequent, hearing court denied that request on April 30, 2014. The contested hearing did not begin until June 2, 2014. Thus, mother had plenty of notice of the hearing.

Moreover, mother fails to identify any prejudice she suffered regarding the stated basis for her motion to bifurcate the proceedings. Her motion was based on the differing burdens of proof at jurisdictional and dispositional hearings, not any difference in the evidence that would not have been admissible at the jurisdictional hearing, but would have been admissible at the dispositional hearing. Indeed, in denying the motion the court noted it was aware of the differing burdens of proof. At the completion of the three

18

day hearing, the court noted that it did not need the parties to address the differences between the burdens of proof for jurisdiction and disposition. When the court announced each of its findings, the court identified the correct, differing burdens of proof. Thus, mother has failed to identify how she was prejudiced and the error was, therefore, harmless. It was not reasonably probable the juvenile court would have rendered different findings and rulings had it bifurcated the proceedings. (*In re A.M.* (2008) 164 Cal.App.4th 914, 928 [the violation of a statutory, rather than a constitutional, right is reviewed under the *Watson*[5] standard under which "we ascertain whether it appears reasonably probable [parents] would have obtained a more favorable result if the juvenile court had granted [their] requests . . . ."].)

### B. Jurisdictional Finding.

Mother contends the court's jurisdictional finding as to the e-5 allegation was not supported by substantial evidence. We disagree.

"'When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the [trial] court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.' [Citation.] However, we generally will exercise our discretion and reach the merits of a challenge to any

---

[5] *People v. Watson* (1956) 46 Cal.2d 818.

jurisdictional finding when the finding (1) serves as the basis for dispositional orders that are also challenged on appeal [citation]; (2) could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings [citations]." (*In re Drake M.* (2012) 211 Cal.App.4th 754, 762-763.)

"In dependency proceedings, the social services agency has the burden to prove by a preponderance of the evidence that the minor who is the subject of the dependency petition comes under the juvenile court's jurisdiction. [Citations.] We review the jurisdictional findings for substantial evidence. [Citation.] We consider the entire record, drawing all reasonable inferences in support of the juvenile court's findings and affirming the order even if other evidence supports a different finding. [Citation.] We do not consider the credibility of witnesses or reweigh the evidence. [Citation.] Substantial evidence does not mean 'any evidence,' however, and we ultimately consider whether a reasonable trier of fact would make the challenged ruling in light of the entire record. [Citation.] The parent has the burden on appeal of showing there is insufficient evidence to support the juvenile court's order. [Citation.]" (*In re Isabella F.* (2014) 226 Cal.App.4th 128, 137-138.)

The juvenile court may adjudge a minor to be a dependent of the court when "[t]he child is under the age of five years and has suffered severe physical abuse by a parent, or by any person known by the parent, if the parent knew or reasonably should have known that the person was physically abusing the child. For the purposes of this subdivision, 'severe physical abuse' means any of the following: any single act of abuse which causes physical trauma of sufficient severity that, if left untreated, would cause permanent

20

physical disfigurement, permanent physical disability, or death; . . . or more than one act of physical abuse, each of which causes bleeding, deep bruising, significant external or internal swelling, *bone fracture*, or unconsciousness . . . ." (§ 300, subd. (e), italics added.)

Here, mother fails to challenge any of the other allegations that the court sustained.[6] Thus, she cannot challenge the court's finding of jurisdiction on those other bases. However, because the juvenile court's finding regarding the e-5 allegation was the basis for its dispositional finding to deny mother reunification services, we will exercise our jurisdiction to address the merits of her claim.

Here, a reasonable finder of fact could have found that mother either inflicted or reasonably knew someone else had inflicted severe physical abuse on A.M., which could have caused permanent disability, or that more than one act of physical abuse causing bone fractures had occurred. Doctors Massi and Young believed the fractures to A.M.'s thigh bone and ribs were the result of physical abuse. MGM was concerned that parents had abused minors. Parents posited no plausible explanation for the injuries. Especially when viewed in context with the evidence of multiple rib fractures sustained by H.M. and the physical injuries inflicted upon C.E., substantial evidence was adduced to support the court's finding.

---

[6] The operative juvenile dependency petition made additional allegations that A.M. suffered serious physical injury due to abuse while in mother's care (a-1); that mother failed to protect C.E. and A.M. from physical abuse (b-1); and that minors' sibling, H.M., had suffered abuse placing minors at risk of similar abuse (j-1).{1CT 215-219} The juvenile court found all these additional allegations true (although the minute order misidentifies the j-1 allegation as a "g" allegation).{2RT 427-428; 3CT 617-618}

C.     Dr. Hyman's Testimony Regarding TBBD.

Parents contend the juvenile court abused its discretion by excluding from evidence testimony from Dr. Hyman regarding TBBD on a *Kelly*/*Frye*[7] basis.  We agree the court erred in excluding the evidence, but find the error harmless.

"'The trial court has broad discretion in deciding whether to admit or exclude expert testimony [citation], and its decision as to whether expert testimony meets the standard for admissibility is subject to review for abuse of discretion.'  [Citation.]" (*People v. Brown* (2014) 59 Cal.4th 86, 101.)  "[A]bsent some special feature which effectively blindsides the [fact finder], expert opinion testimony is not subject to *Kelly*[.]" (*People v. Stoll* (1989) 49 Cal.3d 1136, 1157.)  A testimonial opinion regarding a medical diagnosis is not subject "to the special restrictions governing admission of new, novel, or experimental scientific techniques not previously accepted in the courts.  [Citations.]" (*Id*. at pp. 1140-1141 [reversing as prejudicial error the trial court's exclusion of medical diagnoses on *Kelly*/*Frye* grounds].)

"""We have never applied the *Kelly*[] rule to expert medical testimony, even when the [testimony] is . . . as esoteric as the reconstitution of a past state of mind or the prediction of future dangerousness, *or even the diagnosis of an unusual form of mental illness not listed in the diagnostic manual of the American Psychiatric Association.*"" [Citation.]  Our conclusion in *Stoll* applies fully to this case:  'The psychological testimony proffered here raises none of the concerns addressed by *Kelly*[].  The methods

_____

[7] *People v. Kelly* (1976) 17 Cal.3d 24; *Frye v. United States* (D.C. Cir. 1923) 293 F. 1013.

22

employed are *not* new to psychology or the law, and they carry no misleading aura of scientific infallibility.' [Citation.]" (*People v. Jones* (2013) 57 Cal.4th 899, 953, quoting *People v. Stoll*, *supra*, 49 Cal.3d at p. 1157.)

"It is important to distinguish in this regard between expert testimony and scientific evidence. When a witness gives his personal opinion on the stand—even if he qualifies as an expert—the jurors may temper their acceptance of his testimony with a healthy skepticism born of their knowledge that all human beings are fallible. But the opposite may be true when the evidence is produced by a machine: like many laypersons, jurors tend to ascribe an inordinately high degree of certainty to proof derived from an apparently 'scientific' mechanism, instrument, or procedure. Yet the aura of infallibility that often surrounds such evidence may well conceal the fact that it remains experimental and tentative." (*People v. McDonald* (1984) 37 Cal.3d 351, 372-373 overruled on another ground in *People v. Mendoza* (2000) 23 Cal.4th 896, 912-925.)

Here, any testimony proffered by Dr. Hyman regarding a diagnosis of TBBD, whether accepted in the medical community or not, did not involve the use of a scientific mechanism, instrument, or procedure, which differed from accepted methods such that his opinion should have been excluded. Nevertheless, the error was harmless. (*In re Madison T.* (2013) 213 Cal.App.4th 1506, 1510; *In re Jordan R.* (2012) 205 Cal.App.4th 111, 134 ["To the extent an alleged error violates state evidentiary law, 'even where evidence is improperly excluded, the error is not reversible unless "'it is reasonably probable a result more favorable to the appellant would have been reached absent the error.'"' [Citations.]"].)

23

Here, even if Dr. Hyman had been allowed to opine that H.M or A.M had TBBD, it is obvious the juvenile court would not have given his testimony any credence. Medical Doctors Trenkle and Massi testified TBBD is not a condition generally accepted by the medical community. Dr. Massi testified its progenitor had been discredited. The juvenile court itself stated it "easily disregards the argument of weak bone fragility or fragile bones or brittle bones. There is no medical evidence to support the evidence, and the evidence is contrary to weak bone structure in that [A.M.] and [C.E.], neither have had any medical issues, fractures, or any type of medical type abuse incidents since they were removed from the mother and father." Thus, it is not reasonably probable the juvenile court would have issued differing rulings or findings, had Dr. Hyman been permitted to testify regarding TBBD.

D.     Reunification Services for Mother.

Mother contends insufficient evidence supports the juvenile court's ruling denying her reunification services. We disagree.

"When a 'child [is] brought within the jurisdiction of the court under subdivision (e) of Section 300 because of the conduct of that parent or guardian,' the court may decline to provide reunification services. (§ 361.5, subd. (b)(5).) A child who 'is under the age of five years and has suffered severe physical abuse by a parent, or by any person known by the parent, if the parent knew or reasonably should have known that the person was physically abusing the child' comes within the reach of section 300, subdivision (e). Severe physical abuse is defined to include more than one act of abuse where each act causes a bone fracture. (§ 300, subd. (e).) When the [department] 'proves by clear and

24

convincing evidence that a dependent minor falls under subdivision (e) of section 300, the general rule favoring reunification services no longer applies; it is replaced by a legislative assumption that offering services would be an unwise use of governmental resources.' [Citation.] We review the court's decision to deny reunification services under the substantial evidence test to determine whether it is supported by evidence that is reasonable, credible, and of solid value. [Citation.] 'We do not reweigh the evidence, nor do we consider matters of credibility.' [Citation.]" (*L.Z. v. Superior Court* (2010) 188 Cal.App.4th 1285, 1291-1292.)

As discussed above, Doctors Massi and Young believed the fractures to A.M.'s thigh bone and ribs were the result of physical abuse. MGM was concerned parents had abused minors. Parents posited no plausible explanation for the injuries. Especially when viewed in context with the evidence of multiple rib fractures sustained by H.M. and the physical injuries inflicted upon C.E., substantial evidence was adduced to support the court's finding.

DISPOSITION

The petitions are denied.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
        J.

We concur:

McKINSTER
     Acting P.J.

RICHLI
     J.