Filed 12/30/14  R.R. v. Superior Court CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| R. R.,<br><br>    Petitioner;<br><br>        v.<br><br>THE SUPERIOR COURT OF ORANGE COUNTY,<br><br>    Respondent;<br><br>ORANGE COUNTY SOCIAL SERVICES AGENCY et al.,<br><br>    Real Parties in Interest. | G050819<br><br>(Super. Ct. Nos. DP024465, DP024466)<br><br>O P I N I O N |

Original proceedings; petition for a writ of mandate/prohibition to challenge an order of the Superior Court of Orange County, Caryl Lee, Judge.  Petition granted; writ issued.

Frank Ospino, Public Defender, Laura Jose, Assistant Public Defender, Hong TL Nguyen and Dennis M. Nolan, Senior Deputy Public Defenders, for Petitioner.

No appearance for Respondent.

Nicholas S. Chrisos, County Counsel, Karen L. Christensen, Supervising Deputy County Counsel, and Jeannie Su, Deputy County Counsel, for Real Party in Interest Orange County Social Services Agency.

Law Offices of Harold LaFlamme and Tina Stevens for Minors.


\*          \*          \*


Petitioner R.R. (mother) challenges juvenile court orders in the dependency cases of her two daughters, one-year-old M.E. (baby) and three-year old S.E. (sister). These cases arose out of baby suffering severe head injuries at the age of two months, at which time both children were detained and a dependency petition was filed. Previously under the exclusive care of mother and L.E. (father), baby and sister have been in the custody of maternal grandparents since the inception of their respective dependency cases. At the jurisdictional hearing, expert testimony supported an inference that baby's injuries were caused by child abuse and the court sustained the petitions based on a finding that baby's injuries were inflicted non-accidentally by a parent. At the dispositional hearing, the court denied reunification services to both parents, limited parental visitation rights, and scheduled a permanency hearing for both minors on January 6, 2015. Mother petitions this court for extraordinary relief (Cal. Rules of Court, rule 8.452), primarily asserting she should not be denied reunification services based on the physical abuse of baby, which she now attributes to father.

The horrible injuries inflicted on baby clearly support most of the court's findings and orders pertaining to baby and sister. There is no doubt that the court properly removed minors from the custody of parents, exercised jurisdiction over the minors, and found them to be wards of the court. Nor is there any question that father was properly denied reunification services, overriding the usual requirement that such

2

services be provided to parents of dependent children. (See Welf. & Inst. Code, § 361.5.)[1] The denial of reunification services to mother, however, is a much closer question. Having examined the record and considered the bypass provisions cited by the court in its denial of reunification services (§ 361.5, subds. (b)(5)-(7)), we conclude there is insufficient evidence to support a denial of all reunification services to mother. We therefore grant the petition.

FACTS

*Petition, Detention Report, and Detention Hearing*

On December 11, 2013, Orange County Social Services Agency (SSA) filed a section 300 juvenile dependency petition pertaining to baby and sister. The petition alleged baby was brought to the hospital on December 8 by her parents as a result of what SSA alternately characterized as seizures or convulsions. Upon baby's admittance, a variety of injuries to baby were observed. The injuries included "a skull fracture extending from the right side of her head all the way to the back of the child's skull, a she[a]ring injury to the frontal lobe of the brain, chronic and acute bilateral subdural bleeding on the brain, bruising behind the right ear, old and new retinal hemorrhages, two to three greenish bite marks on her right thigh, possible bite marks on her right calf, and bruising on the top of both feet." The injuries could only be explained by "the unreasonable or neglectful acts or omissions of" the parents, who were the sole caretakers of baby. According to the petition, parents waited approximately 20 hours to take baby to the hospital after observing the first of six to seven convulsions. The

---

[1] All statutory references are to the Welfare and Institutions Code.

petition alleged dependency jurisdiction existed under section 300, subdivisions (a), (b), (e), and (j).[2]

SSA also filed a detention report providing additional detail concerning baby, sister, mother, father, and the circumstances leading to SSA's recommendation to detain both children. Apparently, the parents stated baby "may have received the injuries on [Friday, December 6]; the father was watching his two daughters . . . while the mother was at the store. [Baby] was lying on the bed and [sister] was jumping on the same bed when she fell onto [baby] accidentally striking [baby] with her knee on [baby's] head. Parents stated they noticed [baby] having convulsions on [December 7] but did not feel it was serious. On [Sunday, December 8, baby] was having more convulsions and they brought her to the hospital at 8 pm." "Dr. [Daphne] Wong, child abuse specialist, stated that [sister] could not have caused serious injuries to the child. The parents could not offer a reasonable explanation for any of the child's injuries." Sister was two years old at the time of baby's hospitalization.

The court held a detention hearing on December 12, 2013, at which time the court approved of SSA's removal of the children from their parents' custody. The court found a prima facie showing had been made under section 300 and that there was "a substantial danger to the physical and emotional health" of the children absent their

---

[2] "Any child who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court: [¶] (a) The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian. . . . [¶] (b)(1) The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability or his or her parent or guardian to adequately supervise or protect the child . . . ." "(e) The child is under the age of five years and has suffered severe physical abuse by a parent, or by any person known by the parent, if the parent knew or reasonably should have known that the person was physically abusing the child." "(j) The child's sibling has been abused or neglected, as defined in subdivisions (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions." (§ 300.)

4

removal from parents' custody.  (See § 319, subd. (b).)  Neither parent testified, and counsel for each parent requested that SSA not question them regarding "the substance of the accusations," with father's counsel explicitly referencing his Fifth Amendment right against self-incrimination.  The court ordered monitored visitation of seven hours per week for each parent and ordered "SSA to provide reunification services as soon as possible to reunify child with family."[3]  The court set a trial for January 28, 2014.

*Jurisdiction/Disposition Report*

SSA filed a jurisdiction/disposition report on January 10, 2014.  But a trial did not actually go forward in January.  Multiple continuances were granted (mostly at the request of SSA) and trial did not commence until July.  SSA initially indicated further investigation was needed to determine the cause of baby's injuries before providing a dispositional recommendation, then repeatedly asked for more time to consult with a medical professional concerning baby's injuries.  In this section, we summarize the report and the multiple addenda to the report that were filed prior to the jurisdictional hearing, which took place in July and August 2014.

This case was the family's first contact with SSA and the juvenile court.  Though unmarried, parents had been together for eight years.  Neither parent had a criminal record.  Father was employed in construction work.  The family lived in a rented bedroom in a house in Santa Ana, California.  Mother disciplined her children by taking away toys or threatening to disallow consumption of candy.  According to mother, father occasionally spanked sister with his hand; father denied any use of physical discipline.  There was no evidence of alcohol use, drug use, mental health issues, or domestic

---

[3]  Parents were provided with a packet of information on January 9, 2014, including "Resources and Referrals."  It does not appear that either parents or SSA actually attempted to enroll parents in any educational or therapy programs.  On May 13, 2013, the social worker noted that she had "not received any verification of enrollment or participation in the services the children's parents were given."

violence between parents. After being detained, both children were placed in the care of their maternal grandfather. "The parents are visiting the children regularly and have been cooperative with" SSA. The parents wanted the children returned to their care; both children were too young to state their preferences.

Most of the factual information in the report was based on interviews conducted (around the time of detention) by social worker Wendy Llamas and public health nurse Kevin Jerry.

Mother explained her initial reluctance to take baby to the hospital after the symptoms started as stemming from her ignorance as to the true cause of the baby's problems, as well as her belief that vaccinations received by the baby on December 6 (i.e., a day earlier) might have caused a reaction. Also, father thought mother was exaggerating when mother described the symptoms to him. Though the report did not quote mother, it described these episodes alternately as "seizures" or "convulsions." Mother estimated the symptoms in each of the six or seven episodes to have lasted about a minute. All but the last episode affected half of baby's body; the last episode appeared more extensive. During another interview, mother indicated the first episode was on the right side of her body and could be observed in her eyes, tongue, arm, and leg. There is no additional detail from mother's interview accounts describing precisely what baby looked like during the episodes. Mother claimed she did not know what was happening to baby; the report states mother claims "she did not know what the child was experiencing were convulsions until she got to the hospital." To explain the cause of baby's injuries, mother relayed a story about sister kneeing baby while jumping on the bed, but mother professed to lack details because she was not present. When asked to explain the presence of two greenish marks on baby's right thigh (which appeared to be bite marks), mother could only suggest that baby bruised easily since birth, particularly after going to the doctor. Mother denied that either parent ever hit baby, and asserted her belief that the damage was sustained as a result of sister's play.

6

Father confirmed he was caring for the children alone on the evening of Friday, December 6. Father was cleaning sister's high chair, but he turned toward the bed in time to see sister "fall onto the bed, with her knee hitting the right side of [baby's] head." Baby cried for an unspecified period of time and had a bump on her head. Father put rubbing alcohol and a hat on her head. Father thought baby was okay. Baby did not lose consciousness. When mother noticed baby "trembling" the next day, father was sleeping. Mother awoke him and father stated he thought baby was cold. Father thought there were five to six episodes in total before baby was brought to the hospital, each lasting about one minute. Unlike mother, father recalled baby's entire body (including her facial features) trembling during the episodes he observed, not just one side of her body. Even after observing baby's episodes, father continued to believe baby was merely cold. Baby continued to sleep and act normally when the episodes were over. Father decided to bring baby to the hospital based on the frequency of the episodes, not because the last episode was different from the others. Father did not know how baby sustained bruises on her body; he speculated that they related to her vaccinations. Father claimed mother had previously raised the issue of bruising with the pediatrician, who did not know why the bruising was occurring.

From the beginning of the case, Dr. Wong described baby's injuries consistently with the allegations in the petition. She "asserted that [baby's head] injuries could not have been caused by the two-year-old sister. Dr. Wong added that [baby] was delivered via C-section, indicating that she did not have a traumatic birth," which could have resulted in baby bruising easily. A social worker's written report from December 10, 2013, based on information from another social worker (classified as a special medical intake coordinator) indicated that the "bite marks . . . are very apparent on her Right thigh" and there were "possible bite marks on her Right calf." There was also "bruising on top of both feet," but there was no report as to whether these injuries were obvious.

7

At a December 10, 2013 team meeting (involving parents, grandparents, social workers, and a nurse), a series of statements were made that are sometimes attributed jointly to parents and sometimes attributed to a specific parent. Parents jointly (and mother separately) claimed they did not know baby's shaking symptoms were seizures until they were told this information by health care workers at the hospital. Mother added that another tenant at their residence had told her (at an unspecified time) that baby was suffering from "convulsions." Mother stated her initial belief was that the episodes were a reaction to the December 6 vaccinations. The parents continued to attribute baby's head injuries to sister. The parents are jointly attributed with the suggestion that baby's bruises were "probably caused by the needles used at the hospital when [baby] was born. She had an IV; they put needles all over her body to monitor her sugar levels." Parents are also jointly attributed with a statement about "a lot of forceful movement" during baby's birth. The report of the team meeting directly attributes to father a statement that baby "had needles in her head on the same side as where she is now injured." A statement about baby crying "a lot since birth" was attributed to mother.

On April 14, 2014, SSA filed an addendum report describing a meeting between a social worker and one of the caretakers, maternal grandmother (who is not mother's biological mother). Maternal grandmother reported that parents were visiting at different times; father missed some visits and was not as patient as mother with the children. Maternal grandmother stated her belief that father "could have bitten" baby's leg, based on a prior incident in which father had admitted to biting sister on the cheek. Father "liked to bite." Maternal grandmother believes father "may have" caused baby's injuries. Father supposedly said to maternal grandfather that he would take the blame for the injuries so the children could be returned to mother.

On May 12, 2014, SSA filed an addendum report recommending that the court sustain the petition, declare children dependents of the court, deny reunification services to father and mother, and consider suitable placement orders. The report

8

described a May 7 interview with Dr. Wong. "In summary, Dr. Wong indicated [baby] suffered an injury that is classified as abusive head trauma. Dr. Wong expressed the child sustained non-accidental trauma. Dr. Wong further implied that the child had two different brain bleeds; one chronic and one acute bleed. Dr. Wong opined that shaking the child vigorously would cause the she[a]ring to the frontal lobe of the brain. Dr. Wong indicated the bleeds in the child's head and the skull fracture the child sustained are a result of blunt force trauma and shaking. If left untreated, Dr. Wong expressed the child's seizures may not have stopped and there would be the possibility of death."

SSA added in its evaluation: Baby "will most likely endure permanent damage as a result of her injuries. [Baby] is currently being evaluated by the Regional Center of Orange County . . . . [Baby] is not developmentally on target for her age as evidenced by her reported floppy tone . . . ."

Following this new evidence and SSA's recommendations, mother sought and received an additional continuance to allow her time to retain an expert witness. One final SSA addendum report was filed, on July 1, 2014, prior to trial. Regarding sister, maternal uncle reported that mother was not adequately disciplining sister for misbehavior during visits. Regarding baby, additional seizures had occurred, resulting in medication changes and trips to the hospital.

*Jurisdictional Hearing*[4]

Trial on jurisdictional issues occurred over several days from July 7 to August 5, 2014. Both mother and father refused to testify, invoking their Fifth Amendment right against self-incrimination.

---

[4] At mother's request, the court bifurcated the dispositional issues from the jurisdictional issues. The parties stipulated that evidence admitted at the jurisdictional hearing could be relied on at the dispositional hearing.

9

Dr. Wong, an expert in child abuse, testified first. Dr. Wong relied on her personal evaluation of baby on December 9, 2013, as well as her review of primary care records, lab results (including a computed tomography scan, a magnetic resonance imaging scan, a skeletal survey, an ultrasound, and a chest X-ray), and interviews with mother and Dr. Uyen Dangthy Bui (baby's primary care physician) in forming her opinions about baby. Dr. Wong confirmed the description of her opinions in the SSA reports, i.e., that baby suffered nonaccidental trauma to her head consistent with the allegations in the petition. Dr. Wong believed the lab tests and baby's medical history ruled out the possibility of a bleeding disorder. Dr. Wong does not "believe a two-year-old would be able to generate the force that would cause the serious injuries that [baby] had." "Certainly maybe get a bump on the head. But I don't believe [sister] would be able to cause the force that we see in [baby's injuries]."

Baby suffered from subdural hematomas (i.e., bleeding under the skull) on both sides of her head. The two bleeds "appeared to be of different ages." Dr. Wong believes this indicates two different episodes of abuse. Infection and congenital issues were ruled out as causes of the bleeding. The shearing injury to baby's brain could be caused by "a severe blunt force trauma" or a "shaking force." The skull fracture "had to be caused by some blunt force trauma."

Asked about baby's symptoms upon hospitalization, Dr. Wong testified that baby "presented with seizures." Dr. Wong did not describe the observable manifestations of the seizures. She agreed that seizures "can be seen in abusive head trauma" cases. When asked whether baby's injuries could have caused death, Dr. Wong stated, "[S]he did continue to have quite a few seizures up until the point that she was loaded with medication . . . . Without that, she could have . . . had much more serious consequences . . . ." Dr. Wong opined that baby's injuries could have "caused permanent physical disability" had they "been left untreated." Dr. Wong did not testify regarding

10

the short-term or long-term effects, if any, of the 20 hour gap between baby's first seizure and her hospitalization.

Social worker Kendyl Hicks also testified. Hicks did not opine as to which parent the evidence pointed to as the perpetrator of the abuse. Hicks had no evidence that any particular person inflicted the injuries on baby; she did not know whether father's alleged statements to maternal grandmother would qualify as an admission. Sister had no physical injuries on her body at the time of removal. Parents had no history of alcohol or drug abuse, no history of domestic violence, and no history of mental illness. Hicks agreed that a police report concluded allegations of neglect or abuse against parents in connection with baby's injuries were "unfounded."

Hicks did not speak with the pediatric neurosurgeon, Dr. Louden. Based on her review of the medical records, Hicks was aware that Dr. Louden's opinion about baby's injuries was different in some respects form Dr. Wong's opinion.[5] Hicks agreed it was important for the court to have this information, but she did not provide the information in any of her reports. Hicks did not speak with baby's pediatrician in the course of her investigation, even though Dr. Wong's opinion that there were two separate instances of head injury would indicate the pediatrician had seen baby in between the two

---

[5] The appellate record does not include baby's medical records, of which there were apparently 244 pages. Mother's counsel cross-examined both Dr. Wong and social worker Hicks regarding the contents of those records (and in particular a written statement from Dr. Louden from the time of treatment about whether at least one of baby's injuries was consistent with an accidental cause), but apparently did not seek to admit these records as exhibits. At one point, counsel purported to read into the record Dr. Louden's key comment, "In light of her significant dilation of her subarachnoid spaces, it is reasonable to consider that her subdural hematoma is due to closed head injury that she sustained from her older sister a few days ago." The contents of the records are not included in the SSA reports, which were admitted as exhibits. Dr. Louden was not called to testify at the jurisdictional or dispositional hearing. And, as pointed out by Dr. Wong in her testimony, Dr. Louden's note did not address baby's other injuries, including the skull fracture, which Dr. Louden apparently did not notice during his examination.

11

instances of abuse. Hicks did not know how many times mother had taken baby to her pediatrician. Hicks was aware that baby was taken to the pediatrician for vaccines on December 6, 2013, information she gathered from the medical records. Hicks agreed that there had been no determination as to whether the bite marks on baby's thigh had been caused by an adult or child.

The last witness to testify was Dr. Bui, baby's (and sister's) pediatrician. Dr. Bui conducted "a well-baby check" on baby on October 11, 2013. This was a normal examination for newborns; baby was born in late September 2013. Mother was at the appointment with baby. Baby had no fever and appeared to be well-nourished, hydrated, and comfortable. Baby's head was normal with no sign of trauma. Baby's eyes, ears, nose, and throat were normal. Baby did not have bruises. In sum, Dr. Bui did not find anything wrong with baby on October 11.

Dr. Bui also examined baby on December 3 and December 6, 2013. Dr. Bui became aware that baby had been taken to Saint Joseph's Hospital on November 28, a date on which his office had been closed for the Thanksgiving holiday. Dr. Bui was told that baby was taken to the hospital on November 28 because of vomiting and fever. Dr. Bui examined baby at a December 3 appointment as a follow-up to the hospital visit. Dr. Bui prescribed medication to address baby's vomiting and dehydration. Dr. Bui's diagnosis was that baby had reflux, which was causing the vomiting. Overall, baby appeared to be well-nourished and well-developed; she was "breathing comfortably" and was "not fussy." Baby's head appeared to be normal. Dr. Bui found nothing to raise an alarm during the December 3 examination. Dr. Bui asked mother to bring baby back in two days.

Mother returned on December 6 with baby. Dr. Bui again examined baby and found her "to be well-nourished, well-developed, and in no acute distress." Baby did not appear to be in pain. Dr. Bui did not observe any bruises. Dr. Bui continued to prescribe medication for baby and also gave her vaccinations. Mother always acted

12

appropriately in her interactions with Dr. Bui. Dr. Bui always conducted a thorough examination of baby. Dr. Bui has never noticed any bruising on sister in his examinations of sister.

Dr. Bui recalls talking to Dr. Wong around December 9 or 10. Dr. Bui recalls telling Dr. Wong at that time that he had noticed nothing unusual during examinations of baby.

Dr. Bui was not aware of baby having a disorder that would cause her to bruise easily, and mother never reported to Dr. Bui that baby bruised easily. Dr. Bui is not certified as a child abuse specialist and was not conducting the examinations of baby for the purpose of looking for child abuse or trauma. Dr. Bui agreed one could not necessarily tell from a visual examination whether a child has suffered head injuries like those suffered by baby. A child with head injuries does not always present with acute distress. Vomiting is a symptom of head injury. Dr. Bui opined that most parents would take their child to the hospital "right away" if the child was suffering from seizures.

In closing argument, SSA asserted "it appears clear that [baby's] injuries were caused by a parent. The perpetrator at this time is unknown. However, it is clear that it is either the mother or the father."

The court found the allegations of the petition to be true by a preponderance of the evidence, with section 300, subdivisions (a), (b), and (e) applicable to baby, and section 300, subdivisions (a), (b), and (j) applicable to sister. The court set a dispositional hearing for September 9, 2014. The court noted that one inference to be taken from the record was that father committed the acts of abuse while mother was away on December 6, 2013, but the court ultimately refrained from finding which parent actually committed the abusive acts toward baby. The jurisdictional findings of the court are not the subject of this writ petition.

13

*Dispositional Hearing*

An addendum report was submitted prior to commencement of the dispositional hearing. This report stated that both children were doing well in their placement with the maternal grandparents and described their appearance as healthy. The dispositional hearing occurred over several days, from September 9 to October 1, 2014.

Mother testified at the dispositional hearing. Mother ended her relationship with father two months before her testimony, i.e., in approximately July 2014. Mother ended the relationship after hearing the testimony of Dr. Wong at the jurisdictional hearing. Before hearing the testimony, mother had believed the injuries were accidental, in part based on a statement attributed to Dr. Louden. Mother denies that she committed any abuse of baby. Mother still refuses to directly accuse father of committing abuse, because she was not present and has never seen him commit violence against her children. Mother signed up for parenting and child abuse programs three weeks prior to her testimony.

For the most part, father was never alone with the children for more than 90 minutes. Mother did not agree with father spanking sister on the few occasions he did so. Father admitted to biting sister on her cheek one time, but he never did it again. Father said he "became anxious and that's why he had bitten her." Mother became angry and warned father not to do it again or she would leave him. Now that mother knows there were bite marks on baby's thighs, she agrees father is a risk to baby. Mother noticed bruising on baby after her birth, when hospital staff put needles in her feet, hands, and head.

Mother noticed a little bump on baby's head after she returned from her errand on December 6, 2013. Father explained without inquiry from mother about sister jumping on the bed and hitting baby with her knee. Mother believed father when he told her this. From midnight the next night (i.e., the end of Saturday into Sunday, December 8), baby exhibited periodic episodes of strange movements with one of her hands. The

14

court described mother's physical gestures on the witness stand as mother, "with her hand in a fist, moving at the wrist in a circular motion." Mother did not see baby roll her eyes or baby's body stiffen. Mother was concerned, but she thought it was a reaction to the vaccinations. Baby went to sleep, but then had another episode closer to morning in which her hand moved. Mother did not know what a seizure or convulsion was. Mother stayed home "almost the entire day" until the afternoon of December 8. Baby "had some movements in the morning and then she didn't have anything in the afternoon." While out to get dinner on December 8, baby's hand and feet began to "react a little stronger" and parents took her to the hospital. Father did not object to mother's request to take baby to the hospital and parents immediately proceeded to the hospital once the decision was made to do so. There was no attempt on cross-examination to attack mother's perception of baby's physical appearance during the seizures, including the fact that she had mentioned more than baby's arm in an interview in December 2013.

Mother's aunt testified. She confirmed that mother came to live with her alone (i.e., without father) in July 2014. According to aunt, mother was "very patient" with her children and was an "excellent mother." Aunt's understanding is that baby was hurt when sister kneed her in the head. Aunt believes both mother and father are good parents.

The children's maternal grandfather also testified. He and his wife cared for the minors since the beginning of the dependency cases. According to grandfather, mother has never missed her visitation allotment with the children. Sister cries when mother needs to leave; sister is "too close to her mother . . . ." Mother takes excellent care of her children. Grandfather is very protective of his grandchildren, but has no concern mother would ever harm them. Grandfather does not know who caused baby's injuries.

In closing argument, counsel for father and mother each claimed the more likely perpetrator was the other parent. Counsel for SSA posited "the court does not need

15

to determine who the perpetrator is. It is clear that it is one or both of these parents as the child was only under the care of one or both . . . at any time."

*Dispositional Findings*

The court declared the children to be dependents of the court and found that clear and convincing evidence supported removing the children from the physical custody of parents under section 361, subdivision (c)(1). The court found that reunification services did not need to be provided to parents pursuant to section 361.5, subdivisions (b)(5), (6), and (7). Neither the court's oral statements at the hearing nor the minute order explicitly stated that the findings predicate to denying reunification services were made by clear and convincing evidence. The court found there was "no evidence that [reunification] services would benefit parents and/or the interest of the children . . . ."

In discussing the evidence, the court noted that baby's "injuries, to say the least, were very significant. I think that that was made clear during our jurisdictional hearing. And the evidence did disclose that there was more than one occasion where these injuries were inflicted, as various stages of healing were revealed by the diagnostic testing." "[T]here were visible signs that there was something wrong with this child, acknowledging that some of the serious nature of what was going on was not distinguished until further diagnostic testing was done by medical professionals, of course, but bruising, seizures, . . . and waiting 20 hours to have these checked out is quite staggering in effect." "There were signs that both parents should have been on notice that there was something gravely wrong, and the [section 300, subdivision (e)] count doesn't require that the court point a finger at a specific parent, and that is certainly is not necessary. The analysis that could flow from the [section 300, subdivision (a)] count could certainly suggest that perhaps the injuries were inflicted by father when mother went to the store; however, it is unclear if that actually could be the case in light of the fact that these injuries were from various stages of healing." The court also found fault

16

with mother not initiating treatment services or moving away from father until after the jurisdictional hearing. The court rejected the argument that mother did not have sufficient information before her early on to conclude that baby's injuries were not accidental. Despite the court's refusal to actually conclude as a factual matter that father committed the abuse, the court criticized mother's failure to come to terms with father's apparent abuse of baby.

The court ordered that a permanency planning hearing pursuant to section 366.26 be held on January 6, 2015. And the court approved of SSA's case plan and visitation plan as set forth in its reports.[6]

DISCUSSION

Mother does not challenge the jurisdictional findings of the court in this writ petition, including the section 300, subdivision (e), finding by a preponderance of the evidence that baby "is under the age of five years and has suffered severe physical abuse by a parent, or by any person known by the parent, if the parent knew or reasonably should have known that the person was physically abusing the child." (§ 300, subd. (e).) Case law is clear that SSA may employ a "'res ipsa loquitur' type of argument to support a jurisdictional finding under subdivision (e). There was severe physical abuse of a child under five . . . and the child was never out of her parents' custody and remained with a family member at all times; therefore, [parents] inflicted the abuse or reasonably should have known someone else was inflicting abuse on their child, bringing [baby] within the

---

[6] We grant SSA's request for judicial notice of a subsequent order adjusting the visitation schedule to one 2-hour monitored visit per week for each parent.

17

language of section 300, subdivision (e)." (*In re E. H.* (2003) 108 Cal.App.4th 659, 669-670, fn. omitted.)[7]

Instead, mother challenges the court's orders at the dispositional hearing. The key decision by the court at the dispositional hearing was to deny reunification services to mother; the limits set on visitation and the scheduling of the section 366.26 permanency planning hearing followed logically from the denial of reunification services. SSA defends the court's orders, counsel for minors agree with SSA, and father takes no part in this writ proceeding. "We review the court's decision to deny reunification services under the substantial evidence test to determine whether it is supported by evidence that is reasonable, credible, and of solid value. [Citation.] 'We do not reweigh the evidence, nor do we consider matters of credibility.'" (*L.Z. v. Superior Court* (2010) 188 Cal.App.4th 1285, 1292 (*L.Z.*).)

"Family reunification services play a critical role in dependency proceedings. [Citation.] Unless a specific statutory exception applies, the juvenile court must provide services designed to reunify the family within the statutory period." (*Tyrone W. v. Superior Court* (2007) 151 Cal.App.4th 839, 845.)

The court found that reunification services did not need to be provided to parents pursuant to section 361.5, subdivisions (b)(5), (6), and (7). "Reunification services need not be provided to a parent . . . when the court finds, *by clear and convincing evidence*, any of the following: "(5) That the child was brought within the jurisdiction of the court under subdivision (e) of Section 300 *because of the conduct of*

_____

[7]    As to the section 300, subdivisions (a) and (b) findings, "[w]here the court finds, based upon competent professional evidence, that an injury, injuries, or detrimental condition sustained by a minor is of a nature as would ordinarily not be sustained except as the result of the unreasonable or neglectful acts or omissions of either parent, the guardian, or other person who has the care or custody of the minor, that finding shall be prima facie evidence that the minor is a person described by subdivision (a), (b), or (d) of Section 300." (§ 355.1, subd. (a).)

18

*that parent . . . .*" or "(6) That the child has been adjudicated a dependent pursuant to any subdivision of Section 300 as a result of . . . *the infliction of severe physical harm* to the child, a sibling, or a half sibling *by a parent* . . . and the court makes a factual finding that it would *not benefit the child to pursue reunification services with the offending parent . . . .*" "(7) That the parent is not receiving reunification services for a sibling . . . of the child pursuant to paragraph (3), (5), or (6)." (*Ibid.*, italics added.)  Obviously, subdivision (b)(7) covers sister's situation *if* SSA proved either subdivision (b)(5) or (b)(6) as to baby by clear and convincing evidence.  We must examine the applicability of these two subdivisions separately, as either subdivision could independently support the court's order.

*Section 361.5, subdivision* (*b*)(*6*)

"[S]ection 361.5, subdivision (b)(6) requires the juvenile court to find that a parent inflicted severe physical harm on the child by act, omission or consent before it may deny reunification services to that parent under subdivision (b)(6).  The Legislature did not intend subdivision (b)(6) to apply to deny reunification services to a negligent parent; rather, the parent must have been complicit in the deliberate abuse of the child." (*Tyrone W. v. Superior Court*, *supra*, 151 Cal.App.4th at p. 843; see also *In re Kenneth M.* (2004) 123 Cal.App.4th 16, 21 ["By its express terms, subdivision (b)(6) applies to the parent who inflicted severe physical harm to the minor"].)

"A finding of the infliction of severe physical harm, for the purposes of this subdivision, may be based on, but is not limited to, deliberate and serious injury inflicted to or on a child's body . . . by an act or omission of the parent or guardian, or of another individual or animal with the consent of the parent or guardian; deliberate and torturous confinement of the child . . . in a closed space; or any other torturous act or omission that would be reasonably understood to cause serious emotional damage." (§ 361.5, subd.

19

(b)(6).) "The court shall read into the record the basis for a finding of . . . severe physical harm under paragraph (6) of subdivision (b) . . . ." (*Id.*, subd. (k).)

In its factual findings, the court listed three bases for its conclusion that baby suffered severe physical harm: (1) baby's "very serious" injuries (presumably, the head injuries); (2) the evidence suggesting head injuries were suffered on "more than one occasion"; and (3) the "staggering" effect of "waiting 20 hours" to seek medical attention for baby's injuries, some of which could be observed without the diagnostic testing that ultimately established the seriousness of the injuries.[8] We assume the court intended for all of its findings to apply against mother and review whether there is substantial evidence supporting the court's implicit findings that mother inflicted serious injuries on baby through her acts, consent to father's acts, or omissions.

First, did mother herself inflict baby's serious head injuries? The limited evidence that is available all points to father as the direct perpetrator of the abuse. Father made somewhat incriminating statements suggesting he would take the blame for abusing baby. Father was alone with the baby for enough time to inflict the injuries, a day before the seizures began. Father volunteered a story about sister harming baby when mother returned from her errand, perhaps trying to cover his tracks. Father had spanked sister and bit her cheek in the past, while mother never used physical punishment or force against her children. Mother stood up to cross-examination in denying culpability for baby's injuries.[9] The record lacks substantial evidence for the proposition that mother struck or shook baby.

---

[8] The court's findings leave much to be desired. The court did not specifically explain which acts mother directly perpetrated, consented to, or omitted to perform. (See *In re Kenneth M.*, *supra*, 123 Cal.App.4th at p. 21 [stating that juvenile court must identify perpetrator in making § 361.5, subd. (b)(6) findings].) And the court did not make clear whether it was making these findings by clear and convincing evidence, as required by section 361.5, subdivision (b).

[9] Certainly, much of this evidence can be discounted or ignored because it

20

Second, did mother consent to baby's injuries? SSA suggests this case is akin to *Amber K. v. Superior Court* (2006) 146 Cal.App.4th 553, wherein reunification services were denied to mother under section 361.5, subdivision (b)(6), even though it was clearly the father who was the actual perpetrator of the sexual abuse at issue. (*Amber K.*, at pp. 561-563.) But in *Amber K.*, there was testimony from a child victim that he had told the mother about the sexual abuse over the course of 18 separate incidents; the record thus supported a finding that the mother was an offending parent alongside the father for actively consenting to the abuse. (*Id*. at p. 560-562.) "By its express terms, section 361.5, subdivision (b)(6) applies to a parent who gave actual or implied consent to the sexual abuse of the child by another person, as well as the parent who was the actual perpetrator of the sexual abuse." (*Id*. at p. 561.)

SSA points to mother's prior knowledge of the bite mark on sister's cheek as substantial evidence for the conclusion that mother gave actual or implied consent to baby's head injuries. But there are no details in the record concerning the depth of the bite mark and minimal indications of the circumstances that led to this bite (father claimed he was "anxious"). Moreover, the scale is out of proportion. The bite mark evidence is disturbing, but it is unreasonable to suggest that mother's forgiveness of father's bite of sister amounted to her consent to the brutal infliction of head injuries on baby. Baby also had bruises and bite marks at the hospital. But there is no solid evidence that mother discovered these injuries before baby's hospitalization on December 8. Despite repeated opportunities for medical professionals to inspect baby, up to and including an appointment with Dr. Bui on December 6, there is no evidence anyone

came from parents (primarily mother) and mother's relatives, and the court did not find either parent to be credible. But if the limited evidence pointing to father as the perpetrator is ignored, there is essentially nothing left to determine which parent perpetrated the abuse. To simply throw up one's hands and conclude mother or both parents actually struck baby is an affront to the clear and convincing standard of evidence.

21

suspected child abuse before the December 8 hospitalization. Father's apparent abuse of baby even before the evening of December 6 (as evidenced by expert testimony suggesting there were multiple internal bleeds in baby's head) was uncovered by way of medical tests starting on December 8, not mere observation. There is insufficient evidence supporting a finding that mother consented to baby's abuse.

Third, did mother's omission or omissions inflict serious physical injury on baby? SSA cites *Pablo S. v. Superior Court* (2002) 98 Cal.App.4th 292 in support of the court's finding that mother's ("staggering") failure to immediately take baby to the hospital supports the denial of reunification services. In *Pablo S.*, the minor accidentally broke his leg but his parents failed to seek medical attention for nearly two months. (*Id.* at p. 294.) The court rejected the parents' claim that the application of section 361.5, subdivision (b)(6), was inappropriate because "they did not 'deliberately' or 'consciously' inflict harm on" the minor. (*Id.* at p. 300.) "In light of [the minor's] constant pain and the disfigurement that resulted from the broken leg, the parents' failure to provide medical attention constituted the infliction of serious injury by omission." (*Id.* at p. 301.) In other words, the occasion on which minor suffered his broken leg was beside the point in *Pablo S.* The injury to minor for purposes of the dependency case was caused by the parents' failure to seek medical attention.

In theory, the same rationale could apply to the instant case. Even if mother had nothing to do with the blunt force and/or shaking injuries, one might posit that the 20-hour delay in taking baby to the hospital inflicted serious physical harm in its own right. The court certainly found fault with the delay in taking baby to the hospital in light of her seizures and visible bruising; Dr. Bui's testimony and common sense supports this critique, as most parents would seek medical attention as soon as possible in these circumstances. Taking this line of thought further, it is generally understood that medical care is most effective when delivered as quickly as possible. There is no particular reason to think that the onset of seizures would be an exception to this common

22

understanding. These facts and reasoning amply support the court's jurisdictional and custodial findings as against mother.

But there remains a gap between the court's factual findings and the conclusion that mother should be denied reunification services under section 361.5, subdivision (b)(6) — namely, the need for evidence demonstrating that mother's omission inflicted severe physical harm on baby. This gap is not bridged in the record. The record is vague as to the precise characteristics of what were variously referred to as seizures, convulsions, or "hand movements" (in mother's testimony). This lack of specificity leaves the factfinder in a poor position to decide (1) whether the seizures themselves caused severe physical harm, and (2) whether mother was on *actual* notice (recall that § 361.5, subd. (b)(6), does not apply to negligence) that she was inflicting severe physical harm by not taking baby to the hospital. Mother had shown no reluctance over the course of baby's short life to take her to the hospital or her pediatrician, and she ultimately took baby to the hospital less than a day after the seizures began. Moreover, there is no medical testimony supporting a finding that this 20-hour delay was significant to the physical harm suffered by baby.[10] Were the seizures themselves seriously harmful to baby (or were they merely indications of the severe injury already inflicted upon baby)? Was baby's medical outcome worse because of the 20-hour delay? The trial court could only have reached answers to these questions by way of speculation.

In sum, substantial evidence does not support the court's order under section 361.5, subdivision (b)(6). The juvenile court's order is understandable given the seriousness of baby's injuries, but SSA failed to present sufficient evidence to prove mother inflicted severe physical harm upon baby.

---

[10] Perhaps this failure in proof occurred because SSA relied on medical testimony provided at the jurisdictional hearing rather than recalling Dr. Wong to address issues particular to the dispositional hearing.

23

*Section 361.5*, *subdivision* (*b*)(*5*)

When SSA "'proves by clear and convincing evidence that a dependent minor falls under subdivision (e) of section 300, the general rule favoring reunification services no longer applies; it is replaced by a legislative assumption that offering services would be an unwise use of governmental resources.'" (*L.Z.*, *supra*, 188 Cal.App.4th at p. 1292; see § 361.5, subd. (b)(5) [reunification services may be denied if there is clear and convincing evidence "[t]hat the child was brought within the jurisdiction of the court under subdivision (e) of Section 300 because of the conduct of that parent"]; § 300, subd. (e) [dependency jurisdiction exists if "child is under the age of five years and has suffered severe physical abuse by a parent, or by any person known by the parent, if the parent knew or reasonably should have known that the person was physically abusing the child"].)[11]

It is conceded that mother and father were the sole caretakers for baby and that medical expert testimony supported findings that baby's injuries amounted to severe, nonaccidental physical abuse. "For the purposes of this subdivision, 'severe physical abuse' means any of the following: any single act of abuse which causes physical trauma of sufficient severity that, if left untreated, would cause permanent physical

---

[11] Jurisdictional findings by a preponderance of the evidence under section 300, subdivision (e), are insufficient on their own to deny reunification services pursuant to section 361.5, subdivision (b)(5); "the *facts* underlying the section 300[, subdivision (e)] abuse finding must be established by clear and convincing evidence." (*K.F. v. Superior Court* (2014) 224 Cal.App.4th 1369, 1373 [reversing denial of reunification services].) The court did not explicitly state it was making its findings pursuant to section 361.5, subdivision (b)(5), by clear and convincing evidence. To the extent the court was simply deferring to its jurisdictional findings, reversal is required. It might be assumed, however, that the court was applying the clear and convincing evidentiary standard to its factual findings at the dispositional hearing because the court explicitly noted that its section 361, subdivision (c)(1), findings were made by clear and convincing evidence, and there is significant overlap between the facts relevant to both legal questions. As our analysis on the merits results in relief for mother, we need not resolve this difficulty.

disfigurement, permanent physical disability, or death; any single act of sexual abuse which causes significant bleeding, deep bruising, or significant external or internal swelling; or more than one act of physical abuse, each of which causes bleeding, deep bruising, significant external or internal swelling, bone fracture, or unconsciousness; or the willful, prolonged failure to provide adequate food." (§ 300, subd. (e).)

"Section 300, subdivision (e), and subdivision (b)(5) of section 361.5, . . . do not require identification of the perpetrator. [Citation.] Read together, those provisions permit denial of reunification services to either parent on a showing that a parent or someone known by a parent physically abused a minor. [Citation.] Thus, 'conduct' as it is used in section 361.5, subdivision (b)(5) refers to the parent in the household who knew or should have known of the abuse, whether or not that parent was the actual abuser." (*In re Kenneth M.*, *supra*, 123 Cal.App.4th at p. 21.) But it is certainly possible that a section 361.5, subdivision (b)(5), denial of reunification services could apply to only one parent. "It may well be that the minor's *other* parent was in no way involved, either as the abuser or as one with the requisite knowledge of abuse by another. There is no reason in this type of situation to deny the other, or innocent, parent reunification services." (*In re Joshua H.* (1993) 13 Cal.App.4th 1718, 1732.)

As the analysis in the previous section shows, there is insufficient evidence for a finding that mother directly inflicted baby's head injuries; these injuries constitute the severe physical abuse of baby under section 361.5, subdivision (b)(5). The issue therefore is whether there is substantial evidence supporting the court's implicit finding that mother knew or should have known of the physical abuse of baby, putting aside the court's refusal to classify mother or father as the actual abuser. (See *L.Z.*, *supra*, 188 Cal.App.4th at p. 1292.) It is not required that SSA prove mother was aware of the severity of the abuse of baby, only that mother was aware that father was in fact physically abusing baby. (See *In re Joshua H.*, *supra*, 13 Cal.App.4th at pp. 1729-1732.)

25

The following evidence and argument can be marshaled in support of the court's order. Baby had previously suffered from vomiting problems that led to parents taking her to the hospital. Although medical providers did not diagnose child abuse, these vomiting problems (which are consistent with a prior head injury) and trip to the hospital should have caused mother to become hypersensitive to baby's health. Father had previously bitten sister's cheek, which should have caused mother to distrust him with her children. The bruising and bite marks on baby (discovered by medical personnel on Dec. 8, 2013) should have been observed by mother before December 8 (although perhaps not on or before Dec. 6, as Dr. Bui's examination of baby did not disclose any body marks). To the extent it was actually true that mother was away from home on the night of Friday, December 6, she should have been suspicious of father's story that sister had harmed baby. When baby's seizures began, mother should have known something more serious had happened to baby than an accident involving sister. Mother's delay in taking baby to the hospital and false explanations for baby's injuries (e.g., sister's fall, immunizations, needles at the hospital) are evidence of a cover up. Mother was not credible based on the court's observation of her testimony and demeanor. Perhaps if mother had immediately called an ambulance (for baby's seizures) and the police (to accuse father of abuse) at an appropriate time after the night of December 6 but before 8:00 p.m. on December 8, mother could escape the charge that she knew or should have known about the abuse and therefore contributed to baby's severe physical abuse by not doing anything about it. But mother did neither of these things.

We acknowledge that the seriousness of baby's injuries makes it tempting to believe the worst of mother. And we point out yet again that the evidence certainly supported the court's exercise of jurisdiction over minors, the removal of minors from parents' physical custody, and the denial of reunification services to father. But the evidence is simply insufficient to support the court's implied finding that mother knew or should have known father was abusing baby.

26

*L.Z.*, *supra*, 188 Cal.App.4th 1285, is directly on point.[12] "Z.Z. was two months old and suffered unexplained, nonaccidental injuries while in her parents' care that included a spiral fracture to her left humerus and nine broken ribs." (*Id*. at p. 1287.) The juvenile court sustained a dependency petition under section 300, subdivisions (b) and (e). (*L.Z.*, at pp. 1287-1288.) Mother and father were teenage parents who had issues with domestic violence and alcohol abuse. (*Id*. at p. 1288.) "Although Mother noticed that Z.Z. seemed to be in pain for about a week, her injuries were not discovered until Mother brought her in to a regularly scheduled doctor's visit," at which time the mother expressed concern about the baby's arm and X-rays were taken. (*Ibid*.) After becoming aware of the extent of baby's injuries, mother identified an incident in which father went into Z.Z.'s room after mother and father had argued. Z.Z. cried after father went into her room. (*Id*. at p. 1289.) But the evidence was unclear as to precisely when the injuries were suffered, and the court declined to identify which parent caused Z.Z.'s injuries. (*Id*. at pp. 1289, 1291.)

The *L.Z.* appellate court reversed the juvenile court's denial of reunification services to mother. (*L.Z.*, *supra*, 188 Cal.App.4th at pp. 1293-1294.) The conditions in which Z.Z. was raised "created circumstances that exposed Z.Z. to situations of extreme

---

[12] We note one point of apparent confusion on the part of the trial court and trial counsel for SSA. Both expressed the mistaken view that *L.Z.* was not binding on the trial court because it did not issue from the Court of Appeal in this district. California trial courts are obligated to follow all Court of Appeal decisions, without regard to the geographical location of the authoring Court of Appeal panel. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455; *Cuccia v. Superior Court* (2007) 153 Cal.App.4th 347, 353-354.) Of course, if appellate court decisions are in conflict, trial courts must choose to apply one of the conflicting decisions. (*Auto Equity Sales, Inc.*, *supra*, 57 Cal.2d at p. 456.) And trial courts "ordinarily will follow an appellate opinion emanating from its own district even though it is not bound to do so." (*McCallum v. McCallum* (1987) 190 Cal.App.3d 308, 315, fn. 4.) But this latter point is very different from the comments made on the record by counsel and the court, which suggested *L.Z.* was "not controlling" and "an advisory type of decision the court could rely on," and we hope this footnote clears up any confusion that may exist.

danger. This . . . could support a jurisdictional finding under section 300, subdivision (e) that may be based upon the conduct of either parent." (*L.Z.*, at p. 1293.) But there was insufficient evidence indicating the mother should have been able to know Z.Z. was abused based on her physical condition; the parties stipulated that baby's broken bones could not necessarily be identified absent an X-ray. (*Id.* at pp. 1292-1293.) The juvenile court was focused on the parents' mutual refusal to admit their conduct "rather than ascertaining the legal measure of Mother's conduct required by section 300, subdivision (e)." (*Id.* at p. 1293.) "Baby Z.Z. suffered severe physical abuse. But the statutes do not permit the court to deny a parent reunification services simply because it cannot determine who inflicted the abuse unless it is proven that the parent knew or should have known the baby had been abused." (*Id.* at p. 1294.)

The court in the instant case erred by failing to follow *L.Z.* and grant reunification services to mother. Obviously, there are differences between the situation here and the facts in *L.Z.* Unlike the *L.Z.* mother, baby's mother did not immediately accuse father of the abuse after seeing the results of medical testing; in fact, mother retains some measure of loyalty to her partner of eight years as evidenced by her initial belief that there was an innocent explanation for baby's injuries and her continuing refusal to outright accuse father of inflicting baby's head injuries. But it is unclear why the court should count this against mother when the issue under section 361.5, subdivision (b)(5) is what mother knew or should have known prior to baby's arrival at the hospital (when baby's injuries were actually inflicted), not the position taken by mother at the onset of the dependency case.[13]

---

[13] We acknowledge the difficult spot SSA and the court were put in at the detention and jurisdictional hearings, when both father and mother (the only individuals with significant personal knowledge relating to baby's care) refused to testify. Mother, however, eventually testified at the dispositional hearing. Nothing was uncovered to suggest she was the one who physically harmed baby or that she had actual knowledge of father's actions. And it is unclear why mother should be required to condemn father

28

Another difference between the two cases is that seizures (regardless of whether mother knew what they were or what was causing them) are more serious than arm problems, particularly in light of what we now know about baby's injuries.[14] Mother took baby to the hospital within 20 hours of baby's first seizure, whereas the mother in *L.Z.* took the minor in for a regularly scheduled appointment a week after noticing problems with her arm. We agree with the court's criticism of the parents for the extent of the delay in taking baby to the hospital, and mother's testimony is indicative of an attempt to minimize the fault she bears for not acting sooner. But the missing link in the court's analysis is to suggest that this 20-hour delay somehow demonstrates by clear and convincing evidence that mother was aware father had abused baby. The delay is also entirely consistent with someone unsure of the seriousness of the symptoms and reluctant to rush to the hospital in the middle of the night when baby seemed to recover quickly from the first episode and had just been seen by her pediatrician the day before. Mother eventually took baby to the hospital after the sporadic seizures continued or got worse. As the court acknowledged, it took medical testing to demonstrate the seriousness of baby's head injuries and the nonaccidental source of the injuries. Mother repeatedly took baby to the doctor and hospital throughout baby's brief life (she was only two months old at the time of the dependency petition) for her vomiting issue and regular check-ups,

---

before either the court or SSA were willing to do so. The argument for mother doing so has the benefit of a certain logic: (1) the court was convinced one of the two parents harmed baby; (2) mother knew in her own head whether she abused baby; and (3) accepting the court's axiom and eliminating the impossible (presumably, her own guilt), mother should have been able to deduce that father harmed baby. While Sherlock Holmes would have no trouble reaching the court's preferred conclusion, it is perhaps tougher when one is being asked to condemn the father of one's children and eight-year partner by inference rather than an explicit court finding that he abused baby.

[14] Bruises or skin marks might be more or less concerning than arm problems, depending on the particular bruises or marks. We discuss the issue of baby's bruises and bite marks below.

partially undermining the suggestion that she hoped to cover up for father by avoiding medical care (particularly given Dr. Wong's testimony that there were at least two separate incidents of abuse, the first of which was consistent with baby's vomiting issues). Parental abuse was discovered only upon the December 8 hospital admittance; Dr. Bui did not observe any signs of abuse at baby's December 6 appointment. The delay in taking baby to the hospital only feels convincing as proof of an attempted cover up by mother if one assumes the very fact in dispute, i.e., mother's knowledge of the abuse of baby.

The lack of any substance abuse, domestic violence, or other indication of an unsuitable family environment in the record contrasts with the *L.Z.* parents. The evidence suggests mother and father provided a fairly stable family environment until the abuse suffered by baby. General circumstances did not indicate extreme suspicion of father was warranted. SSA can point to the instance in which father apparently bit the cheek of sister as indicating mother should have known father was abusing baby, but this evidence (while admittedly strange and troubling) by itself cannot support an inference that mother should have known father was physically abusing baby.

Also notable is the court's rejection of mother's credibility and disjointed early reports by parents referencing vaccines and baby's bruises/bite marks.[15] The existence of the bruises and bite marks perhaps come close to supporting the order denying mother's reunification services. These are external indicators (unlike the serious internal head injuries suffered by baby) that are potentially consistent with abuse. The court inferred that mother must have seen these bruises/bite marks before taking baby to the hospital and must have therefore been on notice that father was abusing baby; the attempts by father and mother to explain these marks would naturally then be seen as part of a mutual cover up of abuse. But there are no photos of these bruises/marks in the

---

[15] Mother's lack of credibility, in and of itself, is not positive evidence of the required factual findings under section 361.5, subdivision (b)(5).

30

record; it is particularly unclear whether the bruises on baby's foot were obvious (or "apparent," as the thigh marks were described in a report). And there is no testimony indicating that the marks were such that mother necessarily would have seen them immediately (in December, when baby was likely wearing clothes over her entire body except when her diaper was changed) and that she should have known baby was being abused based on this observation. Dr. Bui noticed nothing wrong with baby two days before her hospital admittance, and there is no evidence that anyone at the hospital noticed bruising or other signs of abuse during baby's first hospital admittance. Thus, to the extent the court was relying on the bruises/marks, the court's conclusion was based on speculation, as there is nothing solid in the record to conclude that mother observed these marks before the December 8 hospitalization and that the marks themselves were sufficient to put a reasonable person on notice of child abuse.

In sum, the record does not include substantial evidence to support a finding that mother knew or should have known parental abuse by father was occurring and was the source of any of baby's health problems.[16]

---

[16] We need not reach the remainder of mother's contentions, which are largely based on the following statutory language: "[T]he court shall not order reunification in any situation described in paragraph (5) of subdivision (b) unless it finds that, based on competent testimony, those services are likely to prevent reabuse or continued neglect of the child or that failure to try reunification will be detrimental to the child because the child is closely and positively attached to that parent. The social worker shall investigate the circumstances leading to the removal of the child and advise the court whether there are circumstances that indicate that reunification is likely to be successful or unsuccessful and whether failure to order reunification is likely to be detrimental to the child." (§ 361.5, subd. (c).) As mother explains, the court did not explicitly address whether sister or baby were closely and positively attached to mother such that the denial of reunification services would be detrimental. And mother takes issue with the quality of SSA's investigation.

DISPOSITION

Let a peremptory writ of mandate issue directing the court to vacate its orders of October 1, 2014, denying reunification services to mother and setting a section 366.26 hearing. The court shall enter new and different orders providing mother with reunification services and concomitant visitation rights appropriate in light of the new reunification order.[17] SSA's request for judicial notice is granted.

IKOLA, J.

WE CONCUR:

O'LEARY, P. J.

FYBEL, J.

---

[17] Given the exceptional delay that occurred in reaching a disposition, the reunification deadlines imposed by the Welfare & Institutions Code are problematic if mother is to receive a fair chance at reunification with her children. All we can do at this point is note our acknowledgement of these difficulties, and leave their resolution to the juvenile court and the parties. Nothing in this opinion, of course, bears on the question of whether mother will be able to successfully reunify with her children.